Opinion by
Montgomery, J.,
The Philadelphia Marine Trade Association is the employers’ collective bargaining agent for the Port of Philadelphia and has appealed in behalf of some of its principals from decisions of the Unemployment Compensation Board of Review allowing benefits to those members of Local 1291 who last had been employed by the Atlantic and Gulf Stevedoring Company, on July *151 3, 1959, to unload the S.S. Caribe docked at Pier 38 South, loaded with cargo of 100-pound bags of sugar, and also allowing benefits to numerous other claimants some of whom were the remaining members of Local 1291 who had not been employed to unload the S.S. Caribe, as previously mentioned, and others who were members of Locals 1242, 1332, and 1566, I.L.A., connected with the Port of Philadelphia.
The members of Local 1291 were stevedores who loaded and unloaded cargo from the vessels. The members of Local 1242 were clerks and checkers who kept records of cargoes entering and leaving the Port. The members of Local 1332 were carloaders who handled the freight before it was loaded onto the vessels and after it had been removed therefrom. The members of Local 1566 were carpenters and maintenance men whose duties were performed both on the vessels and on the piers. The intervening appellees represented all these groups.
Both the referee and the board found that the unemployment of claimants was due to a lockout by the appellant and not such a labor dispute as would have rendered claimants ineligible to recover benefits under section 402(d) of the Unemployment Compensation Law, Act of 1936, December 5, P. L. (1937) 2897, art. IY, §402, 43 P.S. 802(d), as amended. The Bureau of Unemployment Security initially had held that those claimants who had been hired to unload the ship were ineligible but that all of the others were eligible. The referee and the board reversed the bureau as to those who had been held ineligible and held all to be eligible for benefits.
It has been stated repeatedly in cases of this kind that “ ‘The credibility of the witnesses, the weight of their testimony, and the reasonable inferences to be drawn from it are for the board. Our duty is performed by studying the testimony in the light most *152 favorable to the party in whose favor the board has found, giving that party the benefit of every inference which can be logically and reasonably drawn from it.’ ” Ristis Unemployment Compensation Case, 178 Pa. Superior Ct. 400, 408, 116 A. 2d 271, 272; further, that “Most important, however, is the principle that the findings of the Board of Review as to facts, if supported by the evidence, are conclusive.” Progress Manufacturing Company, Inc. v. Unemployment Compensation Board of Review, 406 Pa. 163, 167, 176 A. 2d 632, 634.
The board found, as to those members of Local 1291 who had been hired to unload the vessel, that they had been supplied pallets, each holding twenty-four 100-pound bags of sugar, as the means for hoisting the sugar from the hold to the pier rather than canvas or rope slings which would have prevented the dropping of bags during the movement; that the claimants objected to this means because “of an honest and sincere belief that . . . the use of pallets constituted a genuine and immediate peril to life and limb”, but as a compromise offered to remove the bags by slings and thereafter palletize them by depositing them on pallets placed on the pier; that appellant, through its Executive Secretary, Mr. Corry, at first agreed to this but later rejected the offer and notified claimants, through their representative, that unless they returned to work and submitted their grievance to the regular grievance procedure none of the employers of the Port of Philadelphia would employ any member of Local 1291 beginning July 2, 1959 (other members of Local 1291 worked for employers other than the one having charge of the unloading of the S.S. Caribe); thereafter Mr. Moock, International Vice President of I.L.A., conferred with Mr. Toner of P.M.T.A. and was advised by him “. . . to just get the men back to work using the pallets and a changeover to slings would be *153 made promptly, presumably within an hour”; Mr. Moock thereupon notified claimants to return to work on the S.S. Caribe on July 2, 1959, which they did, but the changeover from pallets to slings was not made; that in operating the pallets many bags fell off creating a condition which appeared as real and immediately dangerous to claimants, whereupon they ceased working; that claimants were always ready to resume work if slings were used, did not institute a picket line but simply refused to perform a given task in a manner they genuinely believed to be perilous to them; on July 2, P.M.T.A., through Mr. Corry, notified Mr. Moock that if the claimants did not return to work on July 3 and use pallets, no members of Local 1291 would be hired in the Port of Philadelphia beginning July 6, 1959, and further, that grievance procedure as provided in their contract would be followed only if claimants resumed working with pallets; claimants returned to work on July 3 with the expectation that a solution would be reached, but again quit at noon, when settlement was not reached and the pallets not changed to slings; that beginning July 6, no member of Local 1291 was hired in the Port of Philadelphia although they “shaped up” (reported for duty) every day; that following a series of meetings, and negotiations with the claimants, the employers and the Federal Mediator Service, former Judge Nochem Winnet was agreed to as an arbitrator “to personally observe the unloading operation and to render a binding decision as to whether or not the use of pallets in unloading was safe”; Judge Winnet observed a test operation, and on July 22 ruled, “The use of pallets to unload bagged sugar from the S.S. Caribe is not a safe operation”; that thereafter work resumed on the vessel with slings, and work generally resumed throughout the Port.
Additional facts found by the board relating to the other claimants were, viz.: Pursuant to the ultimatum *154 of Mr. Corry made July 2, no member of Local 1291 or of any of the other locals were hired on July 6 or until after July 22, although they “shaped up” daily, and between those dates the entire Port of Philadelphia was shut down.
It is apparent that the impasse between P.M.T.A. and the employes was created by the insistence of P.M.T.A. that the stevedores who had been engaged to unload the S.S. Caribe continue working while the disagreement as to whether pallets or slings were to be used was being resolved according-to the grievance procedure established by the collective bargaining agreement between the parties. On the other hand, the employes insisted that the use of pallets created an unnecessary hazard to which they should not be subjected.
Article 13 of the collective bargaining agreement then in existence provided that the employer be given the option of:
“(c) Making the best use of the skill and aptitude of the workers, with the right to apply available mechanism and motive power to minimize wasteful manual work.”
Article 31 provided that:
“All disputes and grievances of any kind or nature whatsoever arising under the terms and conditions of this agreement. . . shall be referred to a grievance committee which shall consist of two members selected by the employer and two members selected by the union.”
As we review the record in this case, the employes did not seriously question the general right of their employers to use pallets instead of slings, or that disputes and grievances were to be submitted to a grievance committee. Although initially they claimed that the use of pallets for the unloading of bagged sugar was contrary to Port practice, their final reason for leaving their jobs was their refusal to work under conditions which they sincerely believed to be dangerous, *155 were demonstrated to be hazardous to life and limb, and were subsequently found by an impartial arbitrator to be unsafe.
We have said that an employe has good cause for leaving his employment and is entitled to benefits if his health or safety is jeopardized by the job assigned to him, although mere dissatisfaction with working conditions is not enough to justify a voluntary separation. Dawkins Unemployment Compensation Case, 358 Pa. 224, 56 A. 2d 254; Ganss Unemployment Compensation Case, 195 Pa. Superior Ct. 444, 171 A. 2d 580; Kinter Unemployment Compensation Case, 180 Pa. Superior Ct. 529, 119 A. 2d 639. This is not questioned by appellant.[1]
The board has found on sufficient evidence that the employes engaged to unload the ship left their jobs because of abnormal hazards. This would entitle them to benefits under our decisions. Therefore, we must affirm the board in its conclusion that such a situation is distinguishable from a mére disagreement as to whether slings or pallets were to be used. Ordinarily, quitting their job over such a ■dispute would not entitle those employes to benefits; however, the use of pallets in raising the cargo from a full hold in this particular case, where the ship and its hatches were small, created an imminent and immediate peril to the workmen therein and a-situation which was more than a mere dispute to be settled under grievance procedures. Therefore, the P.M.T.A. was not justified or within its rights, even under, its contract, in giving the ultimatum to the men to work under those perilous conditions or . . no longshoremen represented by Lo *156 cal 1291 will be hired commencing with the hiring time immediately following the cessation of work.”[2]
The record also sufficiently supports the finding of the board that following that telegram the P.M.T.A. closed the Port of Philadelphia by its refusal to hire any member of Local 1291 or any other persons regularly employed in and about the Port. We cannot find support for appellant’s contention that the other employes involved refused to work in sympathy with those who had refused to unload the vessel. The evidence is to the contrary. They were always ready and willing to perform any duties assigned to them, except the duties of unloading under the hazardous conditions previously discussed. There was a withholding of work by the P.M.T.A. which, under our decisions and those of our Supreme Court, constituted a “lock-out”. Vrotney Unemployment Compensation Case, 400 Pa. 440, 163 A. 2d 91; Lerch Unemployment Compensation Case, 400 Pa. 446, 163 A. 2d 535; Irvin Unemployment Compensation Case, 198 Pa. Superior Ct. 308, 181 A. 2d 854; Hogan Unemployment Compensation Case, 169 Pa. Superior Ct. 554, 83 A. 2d 386.
The responsibility of a work stoppage is assumed against the party whose action constitutes the final cause thereof, and it is the duty of the Unemployment Compensation Board to ascertain the final cause and responsibility. Such findings, when supported by the evidence, are conclusive on appeal.
*157 We find in the record much evidence that it was by the action of the employers represented by P.M.T.A. that the Port was closed and refer particularly to the testimony of Mr. Askew:
“The longshoremen refused to work on the S.S. ‘Caribe’ discharging refined bagged sugar with the use of wooden pallets; as a result of that the employers threatened on July 2 if they would not discharge the sugar, they would lock the port out on Monday July 6. On Monday, July 6, the longshoremen reported to all of the usual hiring places for work and they were refused work that morning.”
The board has found that “Although members of the other Locals involved ‘shaped up’ regularly on July 6, 1959, and thereafter, and were able and available for work, none were hired by any of the employer members of P.M.T.A. because of the dispute involving S.S. Caribe” and, “From July 6, 1959 to July 22, 1959, the entire Port of Philadelphia was shut down by the employer members of the P.M.T.A. because the longshoremen of Local 1291 assigned to the S.S. Caribe would not discharge her cargo with pallets.”
The testimony of the claimants supports these findings; and we find no substantial evidence to the contrary offered by the appellant, which we might say was capriciously disregarded by the board. The substance of Mr. Mason’s[3] testimony was that he attempted on July 6 to increase the skeleton crew of four maintenance men to a full crew of 28 (members of Local 1566) for service commencing July 14, and on that day made another effort, but each effort was made only by talking with the president of Local 1566. In addition to the fact that such testimony was categorically denied, its reasonableness is open to question in light *158 of facts which indicate less need for maintenance men when a port is shut down.[4] The testimony of Commander Mansey, Marine Manager of Northern Metal Company, to the effect that he had endeavored to hire longshoremen to work on ships at the Northern Metal Company Terminal is open to scrutiny, since Commander Mansey did not testify from personal knowledge. Mr. Zebrowski of the Jarko Stevedoring Company, testified he made no effort to hire anyone between July 3 and July 11, but on that day his testimony was limited to the fact that he had given orders and tickets to his foremen to hire. Aside from the fact he made no personal efforts, his testimony must also be viewed from the standpoint of reasonableness. He, unquestionably, had been advised of the ultimatum of P.M.T.A. that no members of Local 1291 would be hired after July 6, and since his company was a member of the P.M.T.A. it would seem unreasonable that his company would go contrary to same and attempt to hire members of Local 1291. Furthermore, his testimony was categorically denied by Mr. Askew, President of Local 1291.
The foregoing being substantially the testimony offered by appellant to establish that its employers were willing to hire for available work, and being denied, we cannot say that the board abused its privilege in refusing to accept it, and in holding that the appellant’s employers were the cause of this work stoppage by reason of their refusal to hire until the condition of their ultimatum was met.
Decisions affirmed.

 R. 109’a: “Counsel Kelly: I’ll stipulate that the Philadelphia Marine Trade Association and no employer in the Association expects men to work under unsafe conditions.”

 Union Exhibit No. 2: Western Union Telegram of July 2, 1959 to James T. Moock, International Vice President of P.M.T.A. from Alfred Corry, Executive Secretary of P.M.T.A.
Also see the testimony of R. L. Askew, President of Local 1291 (B. 30a) : “A. Mr. Corry; he caUed me . . . and he pointed out that if the longshoremen didn’t return to work shortly, the next day, on the S.S. ‘Caribe’ that he was going to lock the port out. On the next day, July 1 . .

 Mr. Mason was general manager of Piers 96-98-100, commonly referred to as Army Base.

 In Stahlman Unemployment Compensation Case — Dravo Corporation v. Unemployment Compensation Board of Review, 187 Pa. Superior Ct. 246, 144 A. 2d 670, we recognized the interrelationship of various groups of laborers and craftsmen and held a strike of one group affected the others. In the present case the lockout of one group had a similar effect on the others.