Ernest Odgers et al., Petitioners *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Arnold Nayowith et al., Petitioners *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Argued January 30, 1985, before President Judge CRUMLISH, JR. and Judges ROGERS, CRAIG, MACPHAIL, DOYLE, COLINS and PALLADINO.

*Jonathan Walters,* with him, *Deborah R. Willig, Nancy J. McCauley* and *Barbara Kraft, Kirschner, Walters, Willig, Weinberg & Dempsey,* for petitioners.

*Michael D. Alsher,* Associate Counsel, with him, *Charles G. Hasson,* Acting Deputy Chief Counsel, for respondent.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., May 23, 1985:

Ernest Odgers and Arnold Nayowith, representing 22,000 Philadelphia School District employees,[1] appeal an Unemployment Compensation Board of Review, hereinafter referred to as "Comp Board," order denying them benefits pursuant to Section 402(d) of the Unemployment Compensation Law[2] because their fifty-one day work stoppage in the Fall of 1981 was found to be a strike and not a lockout.

In this appeal, Odgers and Nayowith contend that the Comp Board capriciously disregarded competent evidence offered on certain factual issues and that the Comp Board erred as a matter of law by concluding that the employees' work stoppage constituted a strike.

---

[1] On October 2, 1981, a test claim agreement was signed by the Philadelphia Federation of Teachers, the Philadelphia School District and the Office of Employment Security which stated that the decision on these claims would constitute precedent for the disposition of similar claims by the other school district employees.

[2] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(d).

Before reaching these contentions, we initiate our review by examining and refining the unique and complex legal and factual relationship between the parties, their collective bargaining agreement, and the work stoppage which started on September 8, 1981 and ended on October 28, 1981.

## The Factual Background

Odgers and Nayowith are members of the Philadelphia Federation of Teachers (PFT), which is the duly certified collective bargaining representative for the large majority of School District employees. The Philadelphia School District is managed by the Board of Education of the School District of Philadelphia, hereinafter referred to as "School Board." 351 Pa. Code §12.12-200. As one of its fiscal responsibilities, the School Board must adopt a balanced budget for each school year. 351 Pa. Code §12.12-303. However, because its members are appointed by the Mayor of Philadelphia, 351 Pa. Code §12.12-201, and not elected by the City's residents, the School Board is constitutionally prohibited from raising revenues through taxation. Pa. Const. art. III, §31; *See Wilson v. Philadelphia School District,* 328 Pa. 225, 195 A. 90 (1937). It depends exclusively on the City, State and Federal governments for its funding.

In September 1980 the School Board and the PFT executed a collective bargaining agreement for the period from September 1, 1980 through August 31, 1982. The pertinent provisions of the contract provided for "full and complete job security" for all employees,[3] a ten percent salary increase for the 1981-82 school year, a guarantee clause requiring the School Board to appropriate adequate funding for the eco-

---

[3] Article B—XV of the agreement. The only exception is that layoffs would be permitted in the event of a decline in student enrollment.

nomic provisions of the agreement and requiring the School Board to refrain from any unilateral abrogation of those terms,[4] and a clause in which the PFT agreed not to ''engage in, instigate, or condone any strike, work stoppage or concerted refusal to perform normal work duties.''[5]

In March 1981 the School District submitted to the Philadelphia City Council a proposed budget for the 1981-82 school year which included full funding for the collective bargaining agreement. In May 1981 City Council rejected the request, and allotted a budget $200 million less than proposed. Soon thereafter, the School District determined that a budget deficit of more than $102,000,000 would occur during the 1981-82 school year if the agreed upon express terms of the contract with the PFT were to be met.

On May 15, 1981, the School Board notified the PFT of this critical development and indicated that it wanted to renegotiate certain provisions of the agreement. The PFT, in its response dated May 18, 1981, refused to renegotiate what it considered to be a viable

---

[4] Article B—XIV of the agreement provides :

During the term of this Agreement, the Board agrees that it will appropriate in its annual budget(s) for each year of the contract sufficient monies to provide for, maintain and guarantee without exception each and every economic provision set forth in this Agreement. The Board further agrees that it will not, under any circumstances, unilaterally abrogate any economic provision of this Agreement during its term.

[5] Article B—XI of the agreement provides :

The Federation and the Board agree that differences between the parties shall be settled by peaceful means as provided in this Agreement. The Federation, will not engage in, instigate, or condone any strike, work stoppage or any concerted refusal to perform normal work duties on the part of any employee covered by this Agreement, and will undertake to exert its best efforts to discourage any such acts by any such employees.

contract and urged that the contract be honored as agreed through August 31, 1982. It did, however, volunteer to assist the School Board in its efforts to induce the City, State and Federal governments to provide sufficient funding to meet its terms.[6]

On May 29, 1981, the School Board adopted a shortfall 1981-82 budget. To meet its budgetary limitations, the School Board then announced that several changes would be initiated and implemented for the ensuing school year, which would include the furlough of a large number of employees and the elimination of the ten percent wage increase.[7] The PFT met with the School Board in an effort to induce a rescission of its decision. When these efforts failed, the PFT on May 29, 1981, filed a complaint in equity in Philadelphia Common Pleas Court seeking 1) to enjoin the School Board from altering the contract terms and 2) a specific enforcement order requiring the School Board to honor the terms of the existing contract through August 31, 1982.

---

[6] N.T., 9/28/81, pp. 61-64.

[7] Finding of Fact No. 6 states that in May 1981 the School District announced that the following changes would be effective during the 1981-82 school year:

    a. class size would be increased from 33 to 37 students;

    b. scholarships would be eliminated;

    c. extracurricular activities would be reduced;

    d. elimination of the 10% pay increase for the 1981-82 school year;

    e. reduction of equipment for non-instructional areas;

    f. elimination of use of school buildings for after-school recreational purposes;

    g. reduction of the number of proposed alterations;

    h. elimination of expansion in curriculum and instruction;

    i. reduction of anticipated short-term interest expenses;

    j. elimination of the expansion of executive and school district management positions; and

    k. lay off approximately 3,500 employees.

In June 1981 the School Board, proceeding to meet its new budget, mailed 3,498 furlough notices to certain employees which indisputably informed them that there was "no position" for any of them in the 1981-82 school year as of September 1, 1981. *See Philadelphia School District v. Unemployment Compensation Board of Review,* 85 Pa. Commonwealth Ct. 526, 483 A.2d 574 (1984).[8]

On August 31, 1981, the first year of the two-year contract expired. On September 1, 1981, the furlough notices became effective and 3,498 employees were laid off by the School Board. On September 4, 1981, the trial court dismissed the PFT's complaint but held that the second year of the contract was still in *existence* if funding would be provided. *Philadelphia Federation of Teachers v. Board of Education of the School District of Philadelphia,* 6 Phila. 222 (C.P. Pa. 1981). As previously stated, adequate funding was never provided by the respective governmental bodies.

The PFT instituted the work stoppage on September 8, 1981, the first scheduled classroom day of the 1981-82 school year. The Comp Board found that the schools were open on that day and that the employees who did cross the picket line were permitted to enter.

Ten days into the work stoppage the School Board filed a complaint in equity in Philadelphia Common Pleas Court seeking to have (1) the work stoppage enjoined and (2) the teachers ordered back to work. On October 7, 1981, that court held that the collective bargaining agreement was effectively *terminated* because of the lack of funding and ordered the employees back to work under the terms of the School Board's May

---

[8] The 3,498 employees who received termination notices in June of 1981 are not involved in this appeal. These employees received benefits pursuant to Section 402.1(1) and (2), 43 P.S. §802.1(1) and (2) of the Law because they had no reasonable expectation of returning to work in September of 1981. *Philadelphia School District.*

1981 decision, reasoning that the PFT had failed to exhaust the procedures required by the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§1101.101—1101.2301, prior to the strike. *Board of Education of the School District of Philadelphia v. Philadelphia Federation of Teachers* (No. 1851 September term 1981, filed October 7, 1981).

The PFT appealed these decisions to this Court. On October 27, 1981, we held that the original two-year contract signed by the parties in September 1980 was in reality, a severable contract, each year being subject to the condition precedent of full funding by the appropriate legislative bodies. We affirmed the September 4, 1981 dismissal of the PFT's equity complaint and affirmed, as modified, the October 7, 1981 injunction by ordering all of the employees, including those who had received layoff notices, back to work under the terms of the parties' last *valid agreement, i.e.,* the terms that existed for the 1980-81 school year. Negotiations were ordered to commence under these terms. *Philadelphia Federation of Teachers, Local No. 3 v. Thomas,* 62 Pa. Commonwealth Ct. 286, 436 A.2d 1228 (1981). The next day all of the School District employees reported to work under the terms of the 1980-81 collective bargaining agreement. This Court's opinion of October 27, 1981, was not appealed by either party.

### The Decision of the Comp Board

Section 402(d) of the Unemployment Compensation Law provides, in the pertinent part:

An employe shall be ineligible for compensation for any week—

. . . .

(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the fac-

tory, establishment or other premises at which he is or was last employed. . . .

In reaching its ultimate determination that the work stoppage constituted a strike under Section 402 (d), the Comp Board adopted as part of its findings of fact, the legal conclusions of this Court and the common pleas courts. From these it reasoned that because the second year of the contract never came into existence on September 1, 1981, both parties were required to make a genuine effort to continue performance as of that date under the terms of the existing status quo, *i.e.*, the 1980-81 contract, while negotiations continued. The Comp Board applied the familiar test in *Erie Forge and Steel Corp. v. Unemployment Compensation Board of Review*, 400 Pa. 440, 444, 163 A.2d 91, 93-94 (1960), for determining whether the work stoppage is a strike or a lockout for unemployment compensation purposes:

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the preexisting terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a "lockout". . . .

The Comp Board denied benefits to Odgers and Nayowith because the PFT failed to make "an unqualified bona fide offer to return to work under the terms of the contract for the 1980-81 school year at any time during the period involved in this appeal."[9]

---

[9] Finding of Fact No. 27.

The Comp Board placed the burden of making the *initial* offer to return to work upon the PFT based on its perception of the clear "import" of the *Erie Forge* test. *Philco Corp. v. Unemployment Compensation Board of Review*, 209 Pa. Superior Ct. 239, 242, 223 A.2d 909, 911 (1966), *aff'd*, 430 Pa. 101, 242 A.2d 454 (1968).

The question of whether a work stoppage is the result of a strike or lockout is a mixed question of law and fact subject to this Court's review. *Unemployment Compensation Board of Review v. Borger Steel Co.*, 30 Pa. Commonwealth Ct. 75, 78, 372 A.2d 969, 971 (1977). In determining eligibility, the claimant bears the burden of proving that the stoppage resulted from a lockout by the employer.

The Comp Board having found that the PFT failed to sustain its burden, our scope of review is limited to a determination of whether the Comp Board's findings of fact can be sustained without a capricious disregard of competent evidence or whether an error of law was made by the Comp Board. *Dennis v. Unemployment Compensation Board of Review*, 55 Pa. Commonwealth Ct. 215, 423 A.2d 458 (1980).

### The Comp Board's Findings of Fact

Essentially, the PFT contends that the Comp Board capriciously disregarded competent evidence when it found that the PFT failed to make a bona fide offer to return to work under the status quo, and further that the Comp Board erred as a matter of law when it placed the burden of making an offer upon the employees given the unique factual matrix of this case.

We agree with the PFT's contention that the Comp Board capriciously disregarded competent evidence by finding that the PFT failed to make a bona fide offer to return to work *at any time* during the period of the work stoppage. While the Comp Board has the

duty as finder of fact to weigh the evidence and determine the credibility of witnesses, it is "not free to ignore the overwhelming evidence in favor of a contrary result not supported by the evidence." *Borello v. Unemployment Compensation Board of Review*, 490 Pa. 607, 618-619, 417 A.2d 205, 211 (1980).

The record clearly establishes that at one time the PFT did make an offer to return to work under the terms of the 1980-81 contract. Under cross-examination at the referee's hearing, James R. Melinson, Esq., Chief Negotiator for the School District, testified:

> Attorney: O.K. So that, it's your clear recollection that at some time, in any event, sometime prior to the court order of October 28th, the union made the offer to you, the management to come back to work without the 10 percent increase?
>
> Melinson: Yes.
>
> Attorney: O.K. And you don't know how long before October 28th that occured [sic], do you?
>
> Melinson: I don't recall exactly.
>
> Attorney: And your [sic] not in a position to say that it did not occur, in fact, prior to September 8th?
>
> Melinson: Yes, without further checking, and my best recollection is that I do not recall whether that was prior September 8th.

(N.T., 2/3/82, p. 56.)

We hold that the Comp Board capriciously disregarded this competent testimony and the testimony of witnesses for the PFT. We strike the Comp Board's Finding of Fact No. 27, which stated that the PFT failed to make a bona fide offer to return to work *at any time* during the period involved in this appeal. It is uncontradicted that the PFT *at some time* after the expiration of the first year of the contract (September

1, 1981) and before the end of the work stoppage (October 28, 1981), offered to maintain the status quo as it existed under the 1980-81 contract. Since the record fails to disclose the precise date when this offer was made, it would appear that remand is the appropriate remedy,[10] however, this is unnecessary due to our disposition of the PFT's additional argument that the Comp Board committed an error of law by requiring it to initiate an offer to return to work under the terms of the 1980-81 contract.

### The Comp Board's Legal Analysis

The PFT contends (1) that the Comp Board erred in applying the *Erie Forge* standard to this unique factual setting because the two-year collective bargaining agreement was still in existence on September 1, 1981, and the School Board's unilateral abrogation of that agreement breached the existing status quo and (2) that if the second year of the contract never came into existence the School Board's intransigent position that its modified 1981-82 budget was the "contract" for the 1981-82 school year relieved the PFT of the duty to offer to return to work under the terms of the 1980-81 contract because any offer would have been futile given these highly unusual circumstances.

The Comp Board counters[11] by arguing (1) that the September 4, 1981 trial court opinion placed the PFT on notice that the second year of the collective bargaining agreement was a nullity, and (2) that the

---

[10] In *High v. Unemployment Compensation Board of Review*, 505 Pa. 379, 479 A.2d 967 (1984), the Supreme Court adopted a week-to-week test under Section 402(d) and ruled that a lockout may be converted into a strike by the conduct of the parties.

[11] It should be noted that the Philadelphia School District did not file a petition for intervention with this Court even though it will be charged by the Office of Employment Security if benefits are awarded.

record does not establish that any offer by the PFT would have been futile in early September 1981.

We review these arguments seriatim.

## Two-Year Agreement

Where a work stoppage occurs *during* the term of any collective bargaining agreement, our courts have applied the "availability of alternative remedies" doctrine in determining whether the work stoppage constituted a strike or a lockout. *Accurti Unemployment Compensation Case*, 187 Pa. Superior Ct. 391, 144 A.2d 673 (1958); *Arbechesky Unemployment Compensation Case*, 174 Pa. Superior Ct. 217, 100 A.2d 396 (1953). Benefits have been denied to employees who have engaged in work stoppages because of (a) an alleged change in the condition of employment,[12] (b) an alleged failure to comply with provisions of the collective bargaining agreement[13] or (c) an alleged violation of state or federal law and regulations.[14] In these cases our courts have reasoned that alternative remedies were available and should have been sought before the employees instituted the work stoppages.

If, as the PFT contends, the two-year collective bargaining agreement was still in existence on September 1, 1981, the PFT was required to seek an alternative remedy to the work stoppage before it was

[12] *See Accurti Unemployment Compensation Case*, 187 Pa. Superior Ct. 391, 144 A.2d 673 (1958), wherein the employer instituted a work survey which the union opposed.

[13] *See Arbechesky Unemployment Compensation Case*, 174 Pa. Superior Ct. 217, 100 A.2d 396 (1953), wherein the employer failed to contribute to a Health and Welfare Fund as required by the collective bargaining agreement.

[14] *See King Unemployment Compensation Case*, 183 Pa. Superior Ct. 629, 133 A.2d 581 (1957), wherein the work stoppage began over a dispute concerning mine safety, and *Cassell Unemployment Compensation Case*, 167 Pa. Superior Ct. 440, 74 A.2d 809 (1950), wherein the work stoppage began because of the employer's failure to comply with a War Labor Board directive.

commenced on September 8, 1981. However, the record discloses that on May 29, 1981, more than three months prior to the work stoppage, the PFT filed a complaint in equity in Philadelphia Common Pleas Court seeking (1) to enjoin the School Board from altering the contract terms and (2) a specific enforcement order requiring the School Board to honor the terms of the existing contract. We hold that this was an appropriate effort by the PFT to employ the "availability of alternative remedies" doctrine.

The Comp Board contends that the PFT's failure to follow the grievance procedures prescribed in the collective bargaining agreement before it instituted the work stoppage violates this alternative remedy doctrine. We disagree. The School Board ignored the express terms of the collective bargaining agreement when it proceeded to adopt and implement its unilaterally modified 1981-82 school year budget.[15] By so doing, the School Board clearly indicated a desire not to be bound by the two-year contract and, in light of the severity of its breach, the legal recourse sought by the PFT was more appropriate and adequate than the filing of a grievance complaint.[16]

---

[15] On September 28, 1981, at a hearing before Philadelphia Common Pleas Court on the School Board's motion for an injunction, Dr. Michael P. Marcase, Superintendent of the School District, testified that it was the School Board's position that the second year of the contract, as modified by the budget allocation, was binding on the parties because prior to his signing on behalf of the School District of the final, formal agreement, his attorney sent an *unanswered* letter to the PFT that it was the School District's position that the contract was valid only to the extent funding was available. (N.T., 9/28/81, pp. 48-59.)

[16] It should be noted that the "availability of alternative remedies" doctrine has not been consistently applied in Pennsylvania. *See Southerland Unemployment Compensation Case*, 202 Pa. Superior Ct. 149, 195 A.2d 138 (1963), wherein the claimants prevailed after a work stoppage was precipitated by a situation involving a risk to

However, it is indisputable that the consequent litigation in this Court resulted in the severance of the single agreement into two distinct parts. Although the PFT can in good faith maintain that a two-year agreement was still in effect on September 1, 1981, its reliance on that argument after the trial court opinion of September 4, 1981, is necessarily misplaced.[17] The work stoppage was instituted September 8, 1981, after the trial court had dismissed the PFT's complaint. Therefore, we must review this case on the basis that the first year of the contract expired, to wit, August 31, 1981, and that no valid agreement commenced on September 1, 1981.

### One-Year Agreement

Where a work stoppage occurs *after* a collective bargaining agreement expires, our courts have applied the ''maintenance of the status quo'' standard as defined in *Erie Forge.* When, as here, the work stoppage takes the form of a strike, the burden is upon the employees to show that they made the initial move to maintain the status quo. *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968). If no such move or offer was made by the employees, they must rely upon the ''futility'' defense enunciated in *Irvin Unemployment Compensation Case,* 198 Pa. Superior Ct. 308, 181 A.2d 854 (1962), and reiterated in *Philco Corp.,* 430 Pa. at 104, 242 A.2d at 456:

the health of the employees. Furthermore, the doctrine has been rejected by many commentators. *See* Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification,* 17 U. Chi. L. Rev. 294, 304 (1950), and Williams, *The Labor Dispute Disqualification— A Primer and Some Problems,* 8 Vand. L. Rev. 338, 371 (1955).

[17] Although the trial court indicated that the contract was still viable to the extent that funding would be available, the *legal* effect of that order was to put the parties in a position where no valid contract was in existence for the 1981-82 school year.

[T]he union need not offer to continue the status quo if it appears that such an offer would definitely not be accepted by management.

The PFT contends that after the School Board's unilateral adoption and implementation of its May 1981 budget, any offer made by the PFT would have been futile. The Comp Board argues that the September 4, 1981 trial court opinion placed the PFT on notice that the second year of the contract was void and that if an offer to return to work under the terms of the 1980-81 contract had been made by the PFT at that time, it may not have been futile.

We agree with the PFT that any offer, in early September 1981, to return to work under the terms of the 1980-81 contract would have been futile. The focus of the *Erie Forge* test is upon the actions of the parties after the expiration of the contract and immediately before the work stoppage. The parties may take hard bargaining positions before the expiration of the contract because, after the contract expires, an award of benefits "must turn on the actual conduct of the respective sides and not upon the rhetoric of [preceding] negotiations." *Borello,* 490 Pa. at 614, 417 A.2d at 211. The conduct of the School Board in this case clearly indicates that it would have been futile for the PFT to offer, in early September 1981, to maintain the status quo as it existed under the terms of the 1980-81 contract.

The following recorded factual developments indisputably support this conclusion.

(1)  The School Board, in May of 1981, unilaterally changed the terms and conditions of hire and fire, effective the beginning of the 1981-82 school year.

(2)  These unilateral changes, specifically the layoff of 3,498 employees, were to be effective commencing September 1, 1981. This lay-

off was contrary to the express terms of the collective bargaining agreement.

(3) Attempts were made by the union to have the school district rescind the aforementioned changes without success.[18]

(4) The PFT on May 29, 1981, in its complaint in equity sought relief by way of specific enforcement requiring the employer to honor the terms of the existing contract.

(5) The employer's furlough notices to the 3,498 employees became effective on September 1, 1981, thus resulting in the first failure or refusal of either party to maintain the status quo as it then existed under the 1980-81 contract.

The School Board's actions were not rhetorical positions but were clear, unmistakable signals of its unwillingness to discharge its obligations under the terms of the 1980-81 contract.

Where employees are confronted with no alternative but returning to work under a unilaterally imposed contract which upsets the existing status quo, there is no duty on them to make an offer to return to work under that status quo. *Philco Corp.; Irvin.* Given the employer's clear intention and conduct during the period May 1981 to September 1, 1981, albeit for its own seemingly cogent reasons,[19] any offer by the PFT to maintain the status quo as it existed under the 1980-81 contract would have been a futile exercise.[20] This conclusion is reinforced by the furlough of the 3,498 employees on September 1, 1981.

---

[18] Finding of Fact No. 7.

[19] The Educational Supplement to the Philadelphia Home Rule Charter requires the School Board to adopt a balanced budget; it does not give the School Board the right to impose on employees and unions employment conditions for which they did not bargain and which were inconsistent with an agreement which was freely, fairly and in good faith negotiated.

[20] *See supra* note 15.

We hold that it would have been futile for Odgers and Nayowith to make an offer to return to work under the terms of the 1980-81 contract because of the School Board's unilateral modification of the collective bargaining agreement and the implementation of its modified budget on September 1, 1981.

We hold that this action by the School Board constituted a lockout under Section 402(e) of the Unemployment Compensation Law and that the Comp Board erred as a matter of law in holding that the PFT did not carry its burden.

The order of the Unemployment Compensation Board of Review is reversed.

#### ORDER IN 1232 C.D. 1983

The Unemployment Compensation Board of Review order, No. B-217242 dated April 18, 1983, is reversed.

#### ORDER IN 1233 C.D. 1983

The Unemployment Compensation Board of Review order, No. B-217243 dated April 18, 1983, is reversed.

Judge WILLIAMS, JR. did not participate in the decision in this case.