William E. KELLY, Petitioner,

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW,**
Respondent.

Robert L. Speschock, Petitioner,

v.

Unemployment Compensation Board of Review, Respondent.

Mark E. Eged, Petitioner,

v.

Unemployment Compensation Board of Review, Respondent.

Glenn A. Warren, Petitioner,

v.

Unemployment Compensation Board of Review, Respondent.

Patricia L. Salego, Petitioner,

v.

Unemployment Compensation Board of Review, Respondent.

Stanley J. Steban, Petitioner,

v.

Unemployment Compensation Board of Review, Respondent.

Commonwealth Court of Pennsylvania.

Argued May 7, 2001.
Decided June 20, 2001.

Thomas A. Cook, Pittsburgh, for petitioners.

Carol J. Mowery, Harrisburg, for respondent.

Craig M. Brooks, Pittsburgh, for intervenor, Westinghouse Government Services Company.

Before DOYLE, President Judge, KELLEY, Judge, FLAHERTY, Senior Judge.

FLAHERTY, Senior Judge.

William E. Kelly, Robert L. Speschock, Mark E. Eged, Glenn A. Warren, Patricia L. Salego and Stanley J. Steban (Claimants) petition for review of an order of the Unemployment Compensation Board of

Review (Board).[1] The Board affirmed the decisions of an unemployment compensation referee (Referee) determining that, pursuant to Section 402(d) of the Unemployment Compensation Law (Law), Claimants are not eligible for unemployment benefits during a work stoppage.[2] We affirm.

Claimants are employed by Westinghouse Government Services Company (Employer) and are represented by the International Brotherhood of Electrical Workers Local #1914 Union (Union). The Union was working under a Collective Bargaining Agreement (CBA) with Employer that became effective on August 30, 1999 and will expire on September 1, 2002. In March of 1999, Employer bought the plant where Claimants work, which had previously been owned by Westinghouse Corporation. Thereafter, Employer notified the Union that it wished to change certain job classifications.[3] The Union did not agree with these changes and filed grievances pursuant to the procedures set forth in the CBA, but was unsuccessful. The Union did not request arbitration, which is the next step in the grievance process.

Additionally, because of the change of ownership, Employer was informed that it needed to change payroll providers, as Westinghouse Corporation would stop handling the payroll after December 31, 1999. Because of the change in the payroll provider, Employer would not be able to get overtime information to the new payroll provider in time for paychecks to be issued on Thursday as specified in the CBA.[4]

The Union, however, was not receptive to the idea of changing the payday to Friday. Therefore, Employer met with the Union to discuss the payroll change. During this meeting, the Union was presented with two options: 1) move the payday to Friday; or 2) keep the payday on Thursday but delay the payment of overtime until the following pay cycle. However, option one would violate the provision requiring a Thursday payday and option two would violate the provision that wages are to be paid for work performed during the pay period ending the previous Sunday. The Union indicated that they would consider the change if employees who signed up for direct deposit of their paychecks were given a $100.00 bonus. Employer rejected this suggestion because it would be unfair to employees that were already utilizing the direct deposit service. The Union was asked to respond to Employer's suggestions by December 6, 1999.

1. Pursuant to a December 6, 2000 order of this court, the cases of the individual Claimants were consolidated for review. We note that these cases were also consolidated for review before the Board.

2. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d).

3. Article XII, Section 2 of the CBA provides that:
   A. Job descriptions and classifications will be established by the company.
   B. *Established job classifications may be reviewed at any time to take into consideration changes in established methods, equipment, or working conditions.*

C. The Company will make available to the Local Union new and revised job descriptions or labor grades as they occur.
D. When jobs are combined, first consideration will be given to the senior qualified *incumbent.*

4. Article XII, Section 6 of the CBA provides that:
   Wages shall be paid weekly on Thursday unless a holiday or some unforeseen condition should make it impractical to have the payroll completed in time. Such wages are for the work performed during the pay period ending the previous Sunday.

The Union did not respond by December 6 and, on December 8, 1999, notified Employer that the employees intended to strike in 48 hours. On December 10, 1999, Employer met with the Union in an attempt to resolve the situation. However, these attempts were unsuccessful and the Union began striking later that evening. Employer sent a letter to the Union on December 10, 1999 stating that:

The deadline for submitting information to the payroll provider has arrived and there is still no way to ensure accurate, timely delivery of paychecks to hourly employees without making a revision in the existing process. Since you have not elected one of the available options, the company has made the decision.

The purpose of this letter is to inform you that the members of IBEW, Local 1914 will be paid on Fridays of every week, beginning January of 2000. We truly believe that this option will have the least impact on employees.

Claimants applied for benefits from December 10, 1999 to March 4, 2000, when the strike ended, but were denied benefits.[5] Claimants filed a Petition for Appeal, and hearings were held before a Referee on July 12, 2000.

Anthony Cortazzo is the president and financial secretary of the Union. Mr. Cortazzo testified that Employer had not changed the payday or job classifications at the time the strike began on December 10, 1999. (N.T. 7/12/00, p. 29). He also stated that the disagreement that precipitated the strike was the payday change, although the Union decided to strike because of the proposal to change the payday and the proposal to change job classifications. However, if Employer had not proposed the payday change, Mr. Cortazzo could not say whether or not the strike would have still occurred. (N.T. 7/12/00, p. 24–26, 35). Mr. Cortazzo also confirmed that the Union never filed a grievance with regard to the payday change (N.T. 7/12/00, p. 29).

Robert L. Speshock, who is a machinist, also testified. Mr. Speshock wanted to retrieve his tools from the plant so he could look for another job. Because it is customary for machinists to own their own tools, Mr. Speshock would not be able to find another job if he did not have his own set of tools. Mr. Speshock called Employer in order to get his tools back, although the record does not indicate when he made this call. However, on January 27, 2000, Mr. Speshock sent Employer a letter stating that "[t]he purpose of this letter is to notify you that my machinist tools are needed so that I can obtain a job. Chuck Hahn and I have spoken on 3 occasions on this issue but to no satisfaction...." Thereafter, on February 1, 2000, Mr. Speshock received his tools. (N.T. 7/12/00, pp. 38–41). Stan Steban and Bill Kelly also testified that they were unable to retrieve their tools. They also stated that, although they knew that there was a possibility of a strike, they did not take their tools with them. Also, they did not attempt to cross the picket line in order to retrieve their tools.

Employer presented the testimony of Linda C. Plumb, who is the human resources manager for Employer. With regard to the removal of personal tools from the plant, Ms. Plumb testified that, if an employee wishes to take personal property out of the plant, the employee would need to get a personal property pass from his supervisor and then get the supervisor to sign the pass to indicate that the employee is not taking any of Employer's property.

---

**5.** As a result of negotiations during the strike, the payday was moved to Friday.

The grievance process contains four steps. First, the Union would submit the grievance to the first line supervisor. Second, the next level of management reviews the grievance. Third, the human resources office reviews the grievance. At the fourth step, either the Union or management may request arbitration. Article 21 of the CBA only allows striking while the CBA is in effect if all steps in the grievance process have been exhausted.[6] (N.T. 7/12/00, p. 55). However, the Union did not file a grievance over the proposal to change the payday from Thursday to Friday. (N.T. 7/12/00, p. 56). Also, although the Union challenged the job classification change through the third step in the grievance process, the Union never requested arbitration. (N.T. 7/12/00, p. 61).

Furthermore, at the hearings, the following exchange took place between Ms. Plum and Employer's Attorney:

Q: Did you say anything to the union about work not being available?

A: No, I did not.

Q: Did the union say anything to you about asking if they could continue to work?

A: No, they did not.

Q: At any time, not only that day of December 10, but prior to it, did you say anything to the union indicating that at any point and time the company would stop or cease having work be available to the employees?

A: No, I did not.

Q: And did the union ever say anything to the company that it would continue to work if the company would not make, not put into effect any changes?

A: No.

Q: Did the company on December 10 state that it was then putting into effect any changes?

A: No. They did not.

Q: Or any time prior to that?

A: No.

(N.T. 7/12/00, pp. 63–64).

■ By decisions and orders dated July 24, 2000, the Referee determined that the Union altered the status quo, as Employer had not implemented any of the proposed changes at the time the Union began the strike. Accordingly, the Referee denied Claimants unemployment compensation benefits. Claimants filed Petitions for Appeal with the Board, which affirmed the decisions of the Referee. These consolidated appeals followed.[7]

6. Article XXI, provides, in relevant part:
Section 1.
Neither the IBEW nor the Local Union will cause or officially sanction its members to cause or take part in any strike ... during the life of this Agreement. This includes disputes which are within the proper scope of the grievance procedure provided in this Agreement, (a) until such grievance procedure has been fully exhausted, and (b) thereafter, except as provided in Section 2 below.
Section 2
When the grievance has been fully exhausted ... such strike shall not be a violation of this article if each of the following conditions is satisfied:
A. If written notice that the Company's reply is unsatisfactory has been given, and

B. If the grievance has not been referred to an impartial umpire or board by mutual agreement of the Local Union and the Company.
C. If written notice that such strike will take place has been given to the Company at least forty-eight (48) hours in advance of the actual strike.

7. Our scope of review in unemployment compensation cases is limited to determining whether constitutional rights were violated, whether errors of law were committed or whether findings of fact are supported by substantial evidence. *Sheets v. Unemployment Compensation Board of Review*, 708 A.2d 884 (Pa.Cmwlth.1998).

Claimants argue that the Referee erred by finding that the Union, rather than Employer, altered the status quo. Claimants also contend that the Referee erred by failing to address the issue of whether the Employer stopped Claimants Speshock, Steban and Kelly from retrieving their tools, thereby precluding them from seeking employment elsewhere.

In unemployment compensation proceedings, the Board is the ultimate factfinder and is empowered to resolve conflicts in the evidence and to determine the credibility of witnesses. Findings made by the Board are conclusive and binding on appeal if the record, when examined as a whole, contains substantial evidence to support those findings. *Curran v. Unemployment Compensation Board of Review*, 752 A.2d 938, 940 (Pa. Cmwlth.2000). Additionally, whether a work stoppage is a lockout or a strike is a mixed question of law and fact that is subject to our review. *Hercules v. Unemployment Compensation Board of Review*, 146 Pa.Cmwlth. 77, 604 A.2d 1159 (1992).

Section 402(d) of the Law provides that an employee shall be ineligible for compensation during any week:

*In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout) at the factory, establishment or other premises at which he is or was last employed:* Provided, That this subsection shall not apply if it is shown that (1) he is not participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (2) he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, or directly interested in, the dispute.

43 P.S. § 802(d).

Claimants argue that this court must apply the test set forth in *Erie Forge and Steel Corporation v. Unemployment Compensation Board of Review*, 400 Pa. 440, 444–445, 163 A.2d 91, 93–94 (1960) to determine whether Claimants or Employer are responsible for the work stoppage. In *Erie Forge,* the Pennsylvania Supreme Court held that:

whether the work stoppage is the responsibility of the employer or the employees is reduced to the following: Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply.

However, when the work stoppage occurs during the term of the collective bargaining agreement, as is the situation in the case *sub judice,* this court has held that we must apply the "availability of alternative remedies" doctrine. *Odgers v. Unemployment Compensation Bd. of Review,* 89 Pa.Cmwlth. 439, 492 A.2d 808 (1985). In *Odgers,* this court held that:

Benefits have been denied to employees who have engaged in work stoppages

because of (a) an alleged change in the condition of employment, (b) an alleged failure to comply with provisions of the collective bargaining agreement or (c) an alleged violation of state or federal law and regulations. In these cases our courts have reasoned that alternative remedies were available and should have been sought before the employees instituted the work stoppages.

*Id.* at 815 (citations omitted).[8] Furthermore, "[w]here the work stoppage takes the form of a strike, the burden is upon the union to show that it made the initial move by offering to maintain the status quo. The union must establish that it was willing to maintain the status quo and that the employer refused to do so." *Zappono v. Unemployment Compensation Board of Review,* 756 A.2d 1195, 1198 (Pa.Cmwlth. 2000).

■ Claimants argue that, pursuant to *Erie Forge,* Employer was the first party to change the status quo and therefore is the party responsible for the work stoppage. Accordingly, Claimants argue that they are entitled to benefits. We disagree.

In *Portec, Inc., RMC Div. v. Unemployment Compensation Board of Review,* 104 Pa.Cmwlth. 629, 522 A.2d 1180, 1181 (1987), this court noted that in *Erie Forge* "[t]he Supreme Court held that when a contract has, in fact, *expired* and a new agreement has not yet been negotiated, the question of whether the work stoppage is the result of a lockout or a voluntary strike must be decided by determining which party first refused to maintain the status quo during the course of negotiations" (emphasis added). However, *Erie Forge* only applies when the collective bargaining agreement has expired. In the case *sub judice,* the CBA was still in effect at the time of the strike. Therefore, we must apply the "availability of alternative remedies" doctrine. The record indicates that the Union chose not to arbitrate the grievance concerning the change in job classifications and did not file any grievances concerning the proposal to change the payday from Thursday to Friday. Because the Union failed to exhaust the grievance procedures set forth in the CBA before initiating the strike and because the Union did not pursue further negotiations to attempt to find a resolution of the matter during the three week period following receipt of the December 10, 1999 letter of Employer, we must conclude that, pursuant to the "availability of alternative remedies" doctrine, Claimants are not entitled to benefits under the Law. Therefore, the Board did not err by affirming the order of the Referee.

Accordingly, the order of the Board is affirmed.[9]

### *ORDER*

AND NOW, June 20, the order of the Unemployment Compensation Board of Review is hereby AFFIRMED.

---

8. In *Avco Corporation v. Unemployment Compensation Board of Review,* 739 A.2d 1109 (Pa.Cmwlth.1999), this court overruled *Hopkins v. Unemployment Compensation Board of Review,* 707 A.2d 1169 (Pa.Cmwlth.1998), *appeal denied,* 555 Pa. 723, 724 A.2d 937 (1998), which extended the "availability of alternative remedies" doctrine to a situation where the parties continued working under an extension of the expired collective bargaining agreement. In the case *sub judice,* however, the contract never expired, so the *Avco* case is inapplicable and the "availability of alternative remedies" doctrine would apply.

9. Because we affirm the order of the Board, the issue of whether the Board and the Referee erred by failing to address whether Employer prevented Claimants from retrieving their tools is moot.