Irvin Unemployment Compensation Case.
Small Tube Products, Inc., Appellant, *v.*
Unemployment Compensation
Board of Review.

Argued March 21, 1962. Before RHODES, P. J., ER-
VIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and
FLOOD, JJ.

*Samuel Leiter*, with him *Benjamin E. Gordon*, of
the Massachusetts Bar, and *Nelson & Campbell*, for em-
ployer, appellant.

*Sydney Reuben*, Assistant Attorney General, with
him *Raymond Kleiman*, Deputy Attorney General, and
*David Stahl*, Attorney General, for Unemployment
Compensation Board of Review, appellee.

*Leo C. Mullen*, for intervening claimants, appellees.

OPINION BY WRIGHT, J., June 13, 1962:

This is a test case to determine the eligibility for
unemployment compensation benefits of approximately
fifty employes of Small Tube Products, Inc., of Al-
toona, Pennsylvania. The claims cover a period be-
tween October 17, 1960, and January 17, 1961. Bene-
fits were allowed by the Bureau of Employment Se-
curity, the Referee, and the Board of Review on the
ground that a work stoppage which resulted in claim-
ants' unemployment constituted a lockout. The em-
ployer has appealed.

The record discloses that appellant is engaged in the manufacture of copper and brass tubing, and claimants were employed as production and maintenance workers. Their final day of work prior to the work stoppage was October 14, 1960. Claimants are members of, and are represented for collective bargaining purposes by, Local 981 United Automobile, Aircraft and Agricultural Implement Workers, hereinafter referred to as the Union. Appellant and the Union had entered into a collective bargaining agreement which was effective up to and including October 2, 1960. In accordance with the terms of this agreement, the Union gave sixty days written notice prior to the expiration date of its intention to terminate the agreement and to negotiate for a new contract.

On August 30, 1960, at a meeting with the Union's shop committee, appellant's president stated that the company was on the verge of shutting down for lack of orders, due primarily to foreign competition. At that time base pay rates averaged out to $1.58 per hour, with additional incentive earnings of fifty cents per hour. The employer suggested that, rather than face a layoff, the employes should agree to work without the incentive pay. Formal negotiations for the new contract began on September 9, 1960. The principal economic issue was the employer's insistence upon eliminating the incentive-wage plan. At a meeting on September 30, 1960, the Union proposed an extension of the contract subject to five-day termination. Appellant finally agreed upon a two-week extension. This agreement was reduced to writing and provided for a termination date of October 16, 1960.

Because of its important effect upon the pivotal issue in this appeal, we will briefly summarize the testimony relating to the final negotiation meeting on October 13, 1960, immediately prior to the work stoppage. It is our duty to view the evidence in the light most

favorable to the party in whose favor the Board has found, giving that party the benefit of every inference which can be logically and reasonably drawn from it: *McGinnis Unemployment Compensation Case*, 184 Pa. Superior Ct. 95, 132 A. 2d 749. Findings of fact made by the Board, if supported by the evidence, are binding on appeal: *Quiggle Unemployment Compensation Case*, 172 Pa. Superior Ct. 430, 94 A. 2d 367.

By the time of the meeting on October 13, 1960, all non-economic issues had been resolved. Appellant on that date eventually offered a one year contract with an increase of ten cents in the base hourly rate, and the elimination of the incentive-wage plan. This was concededly a "drastic" wage cut. The Union countered with a proposal that, if the incentive-wage plan was eliminated, the base hourly rate should be increased to a greater extent. At this juncture, counsel for appellant stated: "That's the final proposal and there is no more". The international representative of the Union then said to appellant's president: "Why don't we extend this agreement here and maybe work this thing out". Before this proposal by the Union could be completed, appellant's president interrupted and said: "There will be no more extensions and that's the final proposal. If it isn't accepted—the plant will be open Monday morning. Anyone coming in to work will be on my terms". The testimony of the international representative in this connection was corroborated by that of the president of the local union and the testimony of a member of the negotiating committee. Following the break-up of the meeting of October 13, 1960, appellant's president made a speech, a copy of which was mailed to each employe, in which he characterized his proposal as final and stated that the incentive plan would be discontinued effective as of Monday, October 17. The union membership failed to report on that date, and the ensuing work stoppage continued until January 17, 1961.

Based on this testimony, the Board made the following finding of fact: "17. The claimants were ready and willing to continue working under the same terms and conditions of employment which existed prior to the expiration of the bargaining agreement on October 2, 1960". We have concluded that this finding is fully supported by the evidence. It seems clear that the negotiations collapsed on the issue of wage reduction, which issue was introduced by appellant, not by the Union. It seems clear further that the Union was willing to consider a substantial reduction in wages and the only question undetermined was the economic issue of how great that reduction should be. It seems clear further that appellant was aware of the Union's willingness to continue working for a reasonable time pending further negotiations, not only on the same terms and conditions, but also on terms and conditions actually more advantageous to the appellant. Finally, it seems clear that the Union was prevented by appellant's attitude from developing and completing its proposal for another extension pending further negotiations.

It is settled law that the responsibility for a work stoppage is assessed against the party whose action constitutes the final cause thereof, and that it is the duty of the compensation authorities to ascertain this final cause and responsibility. See *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 83 A. 2d 386. The test to be applied was recently stated by Mr. Justice COHEN in *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 163 A. 2d 91, as follows:

"In the very delicate and sensitive negotiations which are involved in the development of a new collective bargaining agreement to replace one that is nearing its expiration, all parties must be sincere in their desire to maintain the continued operation of the employer's enterprise. The law contemplates that collective bargaining will be conducted in good faith, with a

sincere purpose to find a basis for agreement. Neither an adamant attitude of 'no contract, no work' on the part of the employes, nor an ultimatum laid down by the employer that work will be available only on his (employer's) terms, are serious manifestations of a desire to continue the operation of the enterprise. While either or both of these positions may legitimately be taken by the parties during the bargaining negotiations prior to the expiration of the existing contract, when the contract has in fact expired and a new agreement has not yet been negotiated, the sole test . . . of whether the work stoppage is the responsibility of the employer or the employes is reduced to the following: Have the employes offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply".

Appellant's principal argument is that the Board did not expressly find that the Union requested a further extension of the existing contract. However, in its discussion the Board makes the following statement: "After negotiations for a new agreement were not successful during the 2-week extension period, the employer clearly indicated that work at its plant would be available after October 17, 1960, only on its terms. To require the union to request a further extension under these circumstances would be to require a vain or useless act, and this the law does not require. The union,

in fact, was willing to continue under the existing terms, whereas the employer desired the wage reduction to meet foreign competition. Therefore, the union, acting on behalf of the employes, cannot be held responsible as to the cause of the work stoppage for failing to continue work under the pre-existing terms and conditions of employment". Inferences to be drawn from the evidence are for the compensation authorities: *Sable Unemployment Compensation Case,* 197 Pa. Superior Ct. 177, 177 A. 2d 115.

Appellant takes the position that the *Vrotney* decision imposes on the Union an affirmative obligation which was not met in the case at bar, and that the ruling of the Board "constitutes an illegitimate broadening of the 'sole test' laid down by the Supreme Court". We do not believe that our Supreme Court intended to require the Union to do a futile thing. It is our view that the Board properly concluded that these claimants went as far as they possibly could to continue working for a reasonable time pending further negotiations, and were not at fault because appellant rebuffed their effort. Appellant cites *Lerch Unemployment Compensation Case,* 400 Pa. 446, 163 A. 2d 535, which involved a labor dispute at Hershey Estates. In that case, only five hours prior to the expiration deadline, the employes offered to extend the status quo on a day-to-day basis. Both this court and the Supreme Court held that this offer was unreasonable under the circumstances. The case at bar presents an entirely different situation. This appellant was prepared to reject any request for a further extension. There is sufficient in this record as a whole to support the Board's position that the Union attempted to request a further extension of the contract in an attempt to resolve the economic issue, and that this effort was thwarted by appellant's ultimatum.

"A lockout is an employer's withholding of work from his employes in order to gain a concession from

them. It is the employer's counterpart of a strike. It may be present in varying factual situations, and no definition can comprehend all its manifestations. The core of a lockout is the act of an employer in withholding work": *McGinnis Unemployment Compensation Case,* supra, 184 Pa. Superior Ct. 95, 132 A. 2d 749. Our review of this record indicates that the Board was warranted in finding that these claimants did everything necessary under the circumstances to continue working pending further negotiations, that appellant was ultimately responsible for the work stoppage, and that the result was a lockout. It therefore follows that unemployment compensation benefits were properly allowed.

Decision affirmed.

___

DISSENTING OPINION BY WATKINS, J.:

I would deny benefits under the provisions of §402(d) of the Unemployment Compensation Law, 43 PS §802(d). It is a far cry from that great labor leader John L. Lewis's proclamation of "no contract no work" to this new idea that a work stoppage is a lockout when brought about, after expiration of a contract, by the employers' firm position that he cannot economically live under the terms of the old contract; and in the face of a similarly firm position by the employees not to accept less but a willingness to continue working under the unacceptable terms of the old contract, while negotiations continue.

In the instant case, notice of the termination of the contract came 60 days before its expiration date. There is nothing to indicate that continued negotiations would have changed the deadlocked position of the parties that existed during the 60-day period of negotiations prior to the expiration date of the contract and the two-week period of negotiations after the expiration date of the contract. This, then, was a reasonable time.

Collective bargaining contemplates negotiations between employer and employees, dealing mutually and freely, at arms length, that will result in a meeting of the minds of the parties in an employment contract. To force the employer to agree to further extensions of the economically unacceptable terms of an expired contract or face the consequences of having a work stoppage interpreted, entirely on that decision, as a lockout sends the employer to the bargaining table at a great disadvantage and destroys any semblance of collective bargaining.

As contributions to the fund come solely from the employers, by this decision the Courts are, in effect, telling employers to continue work under the terms of an expired, economically unacceptable contract or be responsible for financing the work stoppage with unemployment payments from the fund. If unemployment compensation should be paid to striking employees, then the law providing for such payment should come directly from the legislature and not indirectly from the courts.