SCHOTT GLASS TECHNOLOGIES,
INC., Petitioner,

v.

UNEMPLOYMENT COMPENSATION
BOARD OF REVIEW,
Respondent.

Commonwealth Court of Pennsylvania.

Argued May 7, 2003.
Decided Sept. 18, 2003.

Richard M. Goldberg, Wilkes–Barre, for
petitioner.

Richardson T. Eagen, Scranton, for intervenors.

BEFORE: COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN, Judge, and LEAVITT, Judge.

OPINION BY Judge SMITH–RIBNER.

In these consolidated cases Schott Glass Technologies, Inc. (Schott Glass) petitions for review of two orders of the Unemployment Compensation Board of Review (Board) that affirmed two orders of a referee granting unemployment compensation benefits to two representative employees of Schott Glass (Claimants) for several weeks during which there was a work stoppage at the plant. With regard to the group of employees represented by David P. Hartung, Schott Glass questions whether the Board erred in affirming the referee's decision that the work stoppage at issue was a lockout and not a strike, thereby entitling the Claimants to benefits under Section 402(d) of the Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d). Schott Glass raises the same question in regard to the group of employees represented by Richard D. Evans, and in addition it asserts that the referee's decision was not supported by substantial evidence.

I

Schott Glass produces ophthalmic and optical glass. The referee found that the employees involved in the present case are members of the United Food & Commercial Workers Union, Local 726T (Union). A collective bargaining agreement (CBA) covering these employees' employment expired at midnight on June 30, 2001. Article XIX of the CBA, Section 19.1, provided in part:

The Company will maintain, in an insurance company or companies designated by it, insurance policies providing the following benefits for those eligible regular employees who have completed 60 days of continuous employment:

(a) Employees hired prior to August 01, 1998 will have the option to select medical coverage from plans offered by: Blue Cross Blue Shield (traditional indemnity), Access Care II, First Priority Health, and Penn State Geisinger Health Plan.

(b) Employees hired August 01, 1998 and thereafter will have the option to select medical coverage from plans offered by Access Care II, First Priority Health, and Penn State Geisinger Health Plan, and may not enroll in Blue Cross Blue Shield (traditional indemnity) plans.

Employer Ex. E–1.[1]

In June of 2000 Schott Glass informed the Union that it was changing the health insurance coverage for salaried (non-union) employees effective July 31, 2000 to eliminate the Blue Cross/Blue Shield traditional coverage and that the same change would take place for Union members effective July 1, 2001, after the CBA expired. The referee found that Blue Cross/Blue Shield

[1]. In addition Section 19.4 of the CBA provided in part: "The Company will comply with the provisions of the Consolidated Omnibus Budget Reconciliation Act (P.L. 99–272) which shall become effective January 1, 1987." This provision acknowledges the duty of Schott Glass to arrange for availability of continuing COBRA health insurance coverage to be purchased by an employee or former employee for a limited period following separation from employment or other suspension of employee health insurance. *See* 29 U.S.C. §§ 1161 and 1163.

had informed Schott Glass that they were enforcing underwriting changes and that Schott Glass must choose two of three Blue Cross/Blue Shield products and meet underwriting criteria. The Board specifically found that Schott Glass informed the Union on June 1, 2001 that it had received large increases from Blue Cross/Blue Shield, and Schott Glass decided that it would no longer continue the traditional coverage as an option, although it could meet Blue Cross/Blue Shield requirements by ridding itself of competitors in order to maintain traditional coverage, i.e., the status quo. Schott Glass chose instead to offer First Priority and Access Care II plans and a competing medical provider. Prescription drug plans also were changed.[2]

Schott Glass and the Union began negotiating a new contract at the beginning of May 2001. Schott Glass made a final offer on June 27, 2001, which the Union membership voted to reject, and the membership stopped working at midnight on June 30 when the contract expired. There is no dispute that on July 1, 2001 Schott Glass sent Union members a letter, reflected in Ex. E–12, stating that their medical benefit status had changed because of the strike and that the members had the option to continue their health care coverage for an eighteen-month period by electing COBRA coverage. See n. 1 supra. On July 30, 2001, the Union offered to resume work under the exact same conditions as when the work stoppage began, but Schott Glass responded that it was not possible to do so. Terms of a new CBA were agreed to on August 9, 2001, and the work stoppage ended on August 15. Traditional Blue Cross/Blue Shield coverage was available as COBRA continuation coverage for those who had it when the contract expired until Schott Glass requested the end of traditional Blue Cross/Blue Shield on August 15, 2001.

Claimants applied for benefits for weeks ending July 7, 2001 through July 28, 2001. The application of Evans, hired before August 1, 1998, was initially approved on the basis that continuing work under the terms and conditions of the previous CBA was not available to him after July 1, 2001. The application of Hartung, hired after August 1, 1998, was disapproved based on a conclusion that work was available under the same terms and conditions. After hearings the referee determined that the work stoppage constituted a lockout. She concluded that Schott Glass was the first to alter the status quo and that it would

**2.** William D. Roberts of Blue Cross testified that at meetings with management and union representatives in June 2000 and June 2001 he explained that Blue Cross asks that 75 percent of an eligible population be in their products, not just traditional indemnity coverage, but all of their products. Schott Glass met that requirement; however, a second guideline states that if there is a competing plan, then the employer may offer only two Blue Cross-sponsored plans, and one must be equivalent to the competitor. Also the prescription drug program, not part of traditional coverage, and the Access Care II plan, a Blue Cross product, had been changed to eliminate the "single tier" coverage, with one low co-payment regardless of the drug purchased, and to provide "two-tier" coverage, with a higher co-payment for non-generic drugs. N.T. at pp. 36–43.

Evan Arguello, then president of the Union, described a meeting with Roberts and the union consultant from Blue Cross/Blue Shield at which the Union learned that Schott Glass could retain traditional coverage if it eliminated a competitor. N.T. at p. 52. One counter-proposal by the Union was for Schott Glass to retain traditional coverage, and Union members would pay their share of the premium increases. He stated that Bruce Jennings, the president of Schott Glass, responded: "That's not going to happen, gentlemen," which he took as an ultimatum. Id. at p. 53. Arguello stated that the company never agreed to consider keeping traditional coverage. Id. at p. 55.

have been futile for the Union to offer to maintain the status quo. The referee also concluded that the lockout affected all employees, and in two decisions she approved benefits for all of the Claimants. The Board, after making additional findings, affirmed.[3]

## II

■ Section 402(d) of the Law provides in part that an employee shall be ineligible for compensation for any week "[i]n which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed...." Recognizing that a broad range of legitimate bargaining positions exists in contract negotiation, the Supreme Court in *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 444–445, 163 A.2d 91, 93 (1960), created a test to determine whether a work stoppage is a strike or a lockout for purposes of Section 402(d):

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualifi-

cation for unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply.

Maintaining the status quo is another way of stating that the parties must continue the relationship in effect at the expiration of the contract. *Fairview School Dist. v. Unemployment Compensation Board of Review,* 499 Pa. 539, 454 A.2d 517 (1982). Even small changes may disrupt the status quo. *Grandinetti v. Unemployment Compensation Board of Review,* 87 Pa.Cmwlth. 133, 486 A.2d 1040 (1985).

■ Because the purpose of unemployment compensation is to compensate individuals who have been denied work through no fault of their own, logically the test for determining whether a work stoppage resulted from a strike or a lockout requires a determination of which side, union or management, first refused to continue operations under the status quo after the contract technically expired but while negotiations continued. *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968). Where a work stoppage takes the form of a strike, the union must show that it made the initial peace move by offering to continue the status quo. *Philco Corp.* However, under the so-called "futility" doctrine, the union need not offer to continue working under the status quo if it appears that management definitely would not accept it. *Philco Corp.* (citing *Small Tube Products, Inc. v. Unemployment Compensation Board of Review,* 198 Pa.Super. 308, 181 A.2d 854 (1962)).

---

3. In unemployment compensation cases the Board is the ultimate finder of fact. *Craighead–Jenkins v. Unemployment Compensation Board of Review,* 796 A.2d 1031 (Pa.Cmwlth. 2002). The Court's review in administrative agency appeals is limited to determining whether constitutional rights were violated, whether an error of law was committed, whether a practice or procedure of a Commonwealth agency was not followed and whether the findings of fact are supported by substantial evidence in the record. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704; *Gunter v. Workers' Compensation Appeal Board (City of Philadelphia),* 573 Pa. 386, 825 A.2d 1236 (2003).

Schott Glass asserts that for employees in the Hartung group, hired after August 1, 1998, the record shows that work existed under the exact terms and conditions. Under Section 19.1(b) of the CBA these employees were not permitted to elect traditional Blue Cross/Blue Shield coverage when they were hired, and they were not permitted to enroll in that coverage during the annual period of open enrollment. Schott Glass argues that the Union did not comply with the first prong of *Vrotney* because the Union did not offer to return under the terms and conditions of the expired contract until July 30, 2001. With regard to the Evans group, hired before August 1, 1998, Schott Glass asserts that those with traditional coverage when the work stoppage occurred were offered to continue that coverage under COBRA in the July 1, 2001 letter, Ex. E–12. Therefore, these employees had work available to them at the same terms and conditions as before the work stoppage.

Intervenors Evans and Hartung argue that substantial record evidence does not support Schott Glass' assertions that work existed at the time of the work stoppage under the exact terms and conditions as before the work stoppage for both groups of the Claimants. Schott Glass informed the Union as early as June 2000 that it did not intend to maintain traditional Blue Cross/Blue Shield coverage after the contract expired. In Ex. E–4, a letter from human resources to all Union employees dated June 11, 2001, Schott Glass repeated that it had advised the negotiating committee of its intent not to renew traditional coverage. Intervenors note that the human resources director, Joseph Frankel, testified: "[Q:] So if there was no work stoppage or strike, traditional indemnity would not have been an option for employees? [A:] Correct." N.T. at p. 26. Similarly, Frankel was asked: "[Q:] So if the employees returned to work on July 1 of 2001, and there was no contract, would the company have been able to offer both traditional indemnity and Access Care II?" and he responded: "[A:] The company may have been willing to do that, but the choice to continue those plans was not up to the company [and it] wouldn't have been able to offer those two plans." *Id.* at p. 30.

Further, Intervenors argue that substantial evidence shows that Schott Glass would not extend the single-tier drug plan under Access Care II or First Priority Healthcare, contrary to the assertion of Schott Glass that employees already enrolled in those programs who wished to remain would have faced no changes. William Roberts of Blue Cross testified that the two-tier program for Access Care II went into effect July 1, 2001. N.T. at p. 40. Intervenors quote from *Odgers v. Unemployment Compensation Board of Review,* 89 Pa.Cmwlth. 439, 455, 492 A.2d 808, 817 (1985), *aff'd,* 514 Pa. 378, 525 A.2d 359 (1987), regarding the futility exception: "Where employees are confronted with no alternative but returning to work under a unilaterally imposed contract which upsets the existing status quo, there is no duty on them to make an offer to return to work under that status quo."

As for Schott Glass' claims that it continued Blue Cross/Blue Shield coverage past the expiration of the contract, Intervenors point to Frankel's testimony noted above. They quote from Exhibit B–2 from the Bureau of Unemployment Compensation Benefits and Allowances, which is a written summary of an interview with Sandy Herman, a human resources specialist with Schott Glass, who stated that when the contract expired Blue Cross/Blue Shield extended their coverage, as was written in the contract, only for the few employees who elected to pay for COBRA continuation coverage. They note that a plan sponsor is required to provide contin-

uation coverage to a qualified beneficiary who loses coverage as a result of a qualifying event, 29 U.S.C. § 1161,[4] and that a strike or a lockout is such an event, 26 C.F.R. § 54.4980B–4. *See also* 29 U.S.C. § 1163.

The Court agrees that Schott Glass' argument that employment remained available under the same terms and conditions as before the contract expiration because it provided mandated COBRA continuation coverage is entirely misplaced. It is the nature of COBRA continuation coverage that it is offered when regular benefits have ceased, for example, during a work stoppage. As Frankel testified, such coverage would not have been available if the employees had continued working. In addition, a former employee pays the full premium for COBRA continuation coverage, *see* Ex. E–12, rather than the relatively small percentage provided for under the expired CBA. Exhibit E–12 includes on the election form for continuation coverage a schedule of premiums, with monthly premiums for a traditional Blue Cross/Blue Shield family plan as high as $983.35.

This record is totally devoid of any evidence that Schott Glass ever considered permitting employees to continue working for any period after the contract expired under the terms and conditions of their existing Blue Cross/Blue Shield health insurance. Schott Glass disrupted the status quo by insisting on elimination of the traditional coverage at the expiration of the contract and by imposing the two-tier drug plan, and it accepted a work stoppage rather than bargain over the possibility of continuing Blue Cross/Blue Shield. A request by the Union to continue working under the existing terms and conditions would have been futile: when the Union made a formal request on July 30, 2001 Schott Glass responded that it was not possible to provide the same terms and conditions.[5]

Finally, the Court agrees with the conclusion of the referee and the Board that the work stoppage affected all union employees. As noted, even those who did not have and could not elect traditional Blue Cross/Blue Shield were subject to a unilateral change in the structure of their drug plans, and Schott Glass does not explain how the "conditions" of employment would have been the same if the roughly 41 employees in the Hartung group returned when the more than 200 employees in the Evans group were prevented from returning. The Court affirms.

### *ORDER*

AND NOW, this 18th day of September, 2003, the orders of the Unemployment Compensation Board of Review are affirmed.

Dissenting Opinion By Judge COHN.

Respectfully, I dissent. When the Union asked its members to stop working on July 1, 2001, without first offering to continue to work under the pre-existing terms and conditions of employment, I believe the work stoppage took the form of a "strike." I do not believe that the futility

4. Subsection (a) of 29 U.S.C. § 1161 provides: "The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan."

5. Although the futility doctrine clearly applies under the facts here, unions should make a clear offer to continue working under the terms of the expired CBA before a work stoppage even when informed by an employer that it will not allow work to continue under those terms.

doctrine is applicable here because there is no evidence that Employer would not have accepted an offer to continue had one been made. Therefore, I cannot agree that the work stoppage in this case was a lockout. Furthermore, during contract disputes, public policy strongly favors a rule that provides for certainty and predictability, and facilitates the ongoing operation of a business, with the concomitant employment and full wages for employees. The judicially created futility doctrine, in contravention of this policy, instead injects even more uncertainty and unpredictability into this area.

As the majority correctly states, the test for determining whether a work stoppage is deemed a strike or a lockout is:

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a lockout. . . .

*Vrotney Unemployment Compensation Case*, 400 Pa. 440, 444–45, 163 A.2d 91, 93–94 (1960). The determination of which party has the burden of proof depends on whether the work stoppage takes the form of a strike or a lockout. In *Miceli v. Unemployment Compensation Board of Review*, 519 Pa. 515, 549 A.2d 113 (1988), our Supreme Court stated that:

> When . . . the work stoppage takes the form of a strike, the burden is upon the union to show that it made the initial 'peace' move by offering to continue the status quo. . . . Thus, where the [u]nion

membership votes to withhold services and the work stoppage is in the nature of a strike, claimants have the burden of showing that it was the employer who first refused to continue under the status quo. If such proof is produced, the withholding of services would not disqualify them for benefits. Conversely, where . . . the work stoppage takes the form of a lockout, the burden is upon the employer to show that it was the claimants who first refused to continue the operations under the status quo.

*Miceli*, 519 Pa. at 522–23, 549 A.2d at 116 (citations omitted). In the present case, when the Union asked its employees to stop working on July 1, 2001, the work stoppage took the form of a "strike." Thus, under *Miceli*, the Union would have the burden to show that it made the initial "peace" move by offering to continue the status quo.

The Union argues at this point, that it did not need to make the initial peace move by virtue of the futility doctrine, a doctrine created by the Supreme Court as a narrow exception to the *Vrotney* test. Under this doctrine, when the employer has clearly foreclosed the possibility of accepting an offer to continue the status quo, the union need not make such an offer because to do so would be a futile effort. *Irvin Unemployment Compensation Case*, 198 Pa.Super. 308, 181 A.2d 854 (1962). In *Irvin*, the employer desired a drastic wage reduction during its negotiations for a new collective bargaining agreement (CBA) with the union representing its employees. The union had suggested a two-week extension of the status quo pending negotiations. At the end of this period, the union was going to offer another extension but, before it could, the employer's president interjected and stated that the proposal made was final, and further negotiations or extensions of time would not be consid-

ered. The president also stated that anyone coming to work after the expiration of the CBA would be working on the employer's terms. A work stoppage ensued. The Superior Court determined that although the union did not offer to maintain the status quo, it need not have done so because the employer had foreclosed any possibility of maintaining the status quo for a reasonable time by its president's ultimatum. Consequently, the work stoppage was deemed a lockout.

Our Supreme Court, in recognizing the futility doctrine as an exception to the *Vrotney* test, has narrowly defined it. In *Philco Corporation v. Unemployment Compensation Board of Review*, 430 Pa. 101, 242 A.2d 454 (1968), the employer repeatedly and strenuously asserted that plant survival depended on the concessions it was demanding. Negotiations between the employer and the union broke down approximately 36 hours before the expiration of the CBA. At that time, the union membership voted to commence a work stoppage at the expiration of the CBA. The union argued that it would have been futile for it to offer to maintain the status quo at this point. The Supreme Court pointed out that often during the negotiation process, many concessions made by both sides occur only hours before a work stoppage is scheduled. The Court acknowledged that the employer drove a hard bargain with its demands, but determined that a hard bargaining line does not automatically invoke the futility doctrine. Rather, the Court determined that the union had foreclosed any possibility that the employer would accept an offer to maintain the status quo by voting 36 hours before the scheduled work stoppage. Because "[a]t no time did the union offer to extend the status quo; nor did the company make a similar offer, although several representatives did testi-

fy that work *was* available on Monday," *Philco*, 430 Pa. at 107–08, 242 A.2d at 457 (emphasis in original), the Court determined that the futility doctrine did not apply. Consequently, the Court reversed the Board and deemed the work stoppage a strike.

In the case *sub judice*, I believe that the referee erred in determining that the work stoppage constituted a lockout by virtue of the application of the futility doctrine. Although the Union points to Employer's July 1, 2001 letter, which indicated Employer would continue BC/BS benefits through COBRA, as evidence that it would have been futile to ask to maintain the status quo, the Union, by failing to offer to maintain the status quo, foreclosed any possibility that Employer could accept such an offer. As our Supreme Court noted in *Borello v. Unemployment Compensation Board of Review*, 490 Pa. 607, 417 A.2d 205 (1980), much of what occurs during the course of negotiations is posturing and rhetoric. Under the statute, claimants are entitled to benefits where there has been a lockout; any other work stoppage resulting from labor disputes is specifically excluded from coverage. The purpose underlying the standard in *Vrotney* is to enable the parties to continue working while negotiations proceed. *See id.*, 400 Pa. at 443–44, 163 A.2d at 93. Thus, an employer benefits from the continued operation of its business, while its employees benefit from continuing employment and wages. Once a union makes an offer to continue working under the pre-existing terms of the contract, it is clear to both sides that the employer must make a decision either to continue with the status quo, or to be forced to pay unemployment compensation benefits for any subsequent work stoppage. In applying the futility doctrine, we are required to look into a

crystal ball to decipher, in hindsight, posturing for the sake of negotiations from what was an ultimatum.[1] Thus, the certainty and predictability of the consequences of the parties' actions is enhanced where the offer to continue is made. It is for these reasons that the futility doctrine exception to the general rule is so limited, and why the facts supporting it must be very clear before it can be invoked. *Philco.* The majority *suggests* in footnote 5 that unions should make a clear offer to continue working under the terms of an expired CBA before the work stoppage begins, thus recognizing that it is preferable. However, I believe the law requires such an offer.

In conclusion, I believe that the facts of this case are more similar to *Philco* than to *Irvin.* The Union, therefore, had an obligation, under the law, to offer to continue working under the terms of the CBA. Consequently, I would conclude that the work stoppage, as to all employees, was a strike and that unemployment compensation benefits should have been denied.

Accordingly, I dissent.

Judge LEAVITT joins in this dissent.

---

1. The Union, ultimately, did make the offer to continue; however, it was made one month after Claimants had already stopped working. Arguably, the Union did not feel that making such an offer was futile.