**PRESBYTERIAN SENIORCARE,**
Petitioner

v.

**UNEMPLOYMENT COMPENSATION
BOARD OF REVIEW,**
Respondent.

Commonwealth Court of Pennsylvania.

Argued Jan. 31, 2006.

Decided May 23, 2006.

Reargument Denied July 17, 2006.

Robert C. Nagle, Philadelphia, for petitioner.

No appearance entered on behalf of respondent, Unemployment Compensation Board of Review.

Claudia Davidson, Pittsburgh, for intervenor, District 1199P, Service Employees International Union.

BEFORE: SMITH–RIBNER, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Presbyterian SeniorCare, Inc. (Employer) petitions for review of a series of adjudications of the Unemployment Compensation Board of Review (Board) awarding unemployment benefits to Michelle L. Abajace and 113 other employees (Claimants). The Referee found Claimants to be ineligible for benefits because they had been on strike for the entire period of time for which they sought benefits.[1] The Board modified the Referee's decision because it determined that Employer transformed the strike into a lockout when it informed the striking workers that it was implementing the higher wages and "richer" health insurance set forth in its final contract proposal and urging the workers to return to work on those terms. Six weeks later, Employer rescinded its imposition of the new contact terms and invited the striking workers to return to work under the terms of the expired collective bargaining agreement. The Board held that from July 17, 2004, to December 22, 2004, Claimants were out of work because of a lockout. In this case, we consider whether the disruption to the status quo after the expiration of the collective bargaining agreement was the responsibility of Claimants or of Employer.

Employer provides long term care for the elderly. Claimants are employed in a variety of service positions as licensed practical nurses, certified nurse assistants, dietary technicians, housekeepers and maintenance workers. They are all members of the Service Employees International Union, District 1199P (Union) and worked under a collective bargaining agreement (CBA) that expired on April 1, 2004. Claimants continued to work under the terms of the expired CBA while the Union continued to negotiate with Employer. On June 1, 2004, the Union went out on strike, establishing and maintaining picket lines at the workplace.

Consistent with its practice for dealing with employee turnover, Employer placed want ads in the newspaper and interviewed job applicants during the strike.[2] At a bargaining session on June 11, 2004, Employer's chief negotiator, Robert Shoop, stated that the striking workers would be replaced, although there was a dispute about whether he used the word "permanent" in that context.[3] On June 16, 2004, Employer, by its president and executive vice president, sent a letter to each employee, stating that

> we are forced to move ahead to ensure the proper care of our residents. The

---

1. The record is unclear as to how many striking employees have appealed to the Board. The Referee noted that Employer filed an appeal from the UC Service Center's determination with respect to 114 claimants. Originally, 152 service employees went on strike.

2. Mary Porter, Employer's Director of Human Resources, testified at the hearing before the Referee that Employer routinely places advertisements of this type because of the staff turnover. She stated that the recruitment effort was not, initially, undertaken to keep operations going during the strike but only to deal with individual transfers, retirements and resignations.

3. At the hearing, Ms. Porter stated that Shoop used the word "substantial" not "permanent." Reproduced Record at 252a–253a (R.R.—).

response to our Want Ads has been good and we will begin hiring replacement workers.

R.R. 60a. On that same day, the local newspaper, the *Washington Observer–Reporter*, reported that "[Employer] said Tuesday it has begun hiring permanent replacement workers to staff its operations." R.R. 53a.[4]

On June 24, 2004, Employer sent a second letter to each employee, stating, *inter alia*, that it had

made a final offer to [the] Union of wage increases for each year of a three year agreement, a richer health insurance plan and a variety of other terms and conditions of employment which would be to [Claimants'] benefit.

R.R. 61a. Because the Union had rejected this offer, Employer observed that "[we] obviously are at an impasse." *Id.* As a result, Employer informed Claimants that it was exercising its right to implement its contract proposal, the terms of which were as follows:

Hourly wage increases of $.25 across the board will be effective Tuesday July 6, 2004. Fulltime employees voluntarily returning to work before July 1 will be covered under the UPMC Health Plan effective July 1. Employees who return to work after that date and are otherwise eligible for health insurance benefits will be covered the first of the next month following their return to work date.

R.R. 61a. The letter concluded by stating,

We hope you will be part of our future. We are looking forward to seeing you back at work soon. Your managers and supervisors as well as Mary Porter are available to talk with you about a return to work date.

R.R. 62a.

■ In response, the Union filed an unfair labor practice charge with the National Labor Relations Board, disputing Employer's contention that it could institute the new terms of employment because the parties were at a negotiating impasse.[5]

---

**4.** The reporter testified before the Referee that he received that information directly from Earl Bugaille, chief spokesperson for Employer. The use of this adjective was disputed by Employer, and the word "permanent" did not appear in subsequent news accounts.

**5.** Under Section 8 of the National Labor Relations Act (NLRA), parties to a labor dispute have a duty to bargain in good faith. 29 U.S.C. §§ 158(a)(5), (d). An employer that unilaterally changes the terms of employment before bargaining with the union to an impasse violates its duty to bargain in good faith. *Litton Financial Printing Division v. National Labor Relations Board*, 501 U.S. 190, 198, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). Disputing Employer's contention of an impasse, the Union filed unfair labor practice charges with the National Labor Relations Board; the charges were settled on October 20, 2004. At the hearing before the Referee, Ms. Porter testified as follows:

There were a number of charges that the Union filed, alleging that we had violated certain laws. And we entered into a settlement with the [NLRB] to more or less say, yes we did this, and they told us what we needed to do to rectify that.

R.R. 206a–207a. As part of that settlement, Employer posted notice stating, *inter alia*,

WE WILL NOT fail and refuse to bargain in good faith with the Union as the exclusive collective-bargaining representative of our employees ... by improperly declaring impasse and by implementing portions of our final proposal without reaching a good faith overall impasse in negotiations.

\* \* \*

WE WILL, upon request, rescind the changes to wages and health care benefits unilaterally implemented beginning July 1, 2004, and restore the health care benefit plan in effect prior to July 1, 2004, and WE WILL make whole, with interest, any unit employees who have suffered any loss by our changing the health insurance coverage.

On August 23, 2004, at a bargaining session between Employer and the Union, Employer delivered a letter to the Union, stating that Employer

> withdraws any contention that the Parties were at a bargaining impasse on or about July 2, 2004, or at any time thereafter.

R.R. 369a. It further stated that Employer

> withdraws the terms and conditions unilaterally imposed on July 2, 2004. [Employer's] intention is to recreate the *status quo ante*. However, to the extent that the Union wishes to agree that one or more of the imposed terms should remain in place, we are prepared to enter into such an agreement.

*Id.*

The Union responded on August 26, 2004, requesting (1) clarification of the proposals in Employer's August 23rd letter and (2) information about the terms of employment for the replacement workers hired during the strike.[6] On September 10, 2004, Employer responded by referring the Union back to the June 24, 2004, letter, which specified each contract change. Employer did not respond to the Union's request for information about the compensation of replacement workers.

Following this exchange, the parties conducted three more bargaining sessions in the fall of 2004. During this period, the Union did not respond to Employer's August 23rd withdrawal of the unilateral changes it made in July. At the December 8, 2004 bargaining session, when asked if the Union intended to respond to Employer's August 23rd return to the status quo, the Union's bargaining representative stated that it would not.[7] As a result, the strike continued until December 17, 2004, at which time the Union made an unconditional offer to return to work on behalf of all Claimants. Claimants returned to work on December 22, 2004.

Claimants applied for unemployment compensation benefits for the entire period of the work stoppage, *i.e.*, from June 1, 2004, to December 17, 2004. On October 8, 2004, the UC Service Center issued a notice of determination denying benefits to Claimants effective the week ending June 5, 2004, through July 10, 2004, because during this period Claimants had been on strike, which rendered them ineligible under Section 402(d) of the Unemployment Compensation Law (Law).[8] The

R.R. 373a (emphasis original). This notice was posted in Employer's facility on October 25, 2005.

6. In its request for clarification, the Union specifically requested, "[a]n explanation of what terms and conditions were 'unilaterally imposed on July 2, 2004', as well as whether any other term or condition of employment was extended or promised to any hourly employee on or after July 2, 2004...." R.R. 386a.

7. Ms. Porter testified as follows:
> We asked Mr. Alcolf [sic] if he would give us an answer as to what the Union wanted us to do in regards to the unilateral changes. And he said that he didn't have to tell us anything. That the [NLRB] stated that, that they had to say when, and he

> [would] pull the trigger on that issue when he felt like it.

R.R. 206a. Larry Alcoff was the Union's bargaining representative.

8. Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(d). Section 402(d) of the Law provides that an employee shall be ineligible for compensation for any week:

> (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: Provided, That this subsection shall not apply if it is shown that (1) he is not participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (2)

UC Service Center approved benefits beginning with the week ending July 17, 2004, finding the cause of the work stoppage at that point had changed from a strike to a lockout because of Employer's letter of June 24, 2004. Employer appealed all 114 decisions. Before the Referee, the Union agreed that Claimants were not entitled to compensation benefits for the period from June 5, 2004, through July 10, 2004, because the Union had called the strike. After a lengthy hearing, the Referee reversed the UC Service Center's determination to award benefits from July 17, 2004, to December 22, 2004. The Referee denied Claimants unemployment compensation benefits for any week during this five-month period, concluding that the work stoppage was the responsibility of the Union.

 Claimants appealed to the Board, and it affirmed in part and reversed in part. The Board found that by unilaterally implementing its last bargaining proposal and hiring replacement workers, Employer made it not "feasible" to return to the status quo. It held that the strike was converted into a lockout as of the week ending July 10, 2004, making Claimants eligible for benefits for the weeks ending July 17, 2004, and thereafter. Employer then petitioned this Court for review of the Board's decision.[9]

Employer raises two issues for our consideration. First, Employer contends that the Board erred because the record supports only one conclusion, namely that the entire period of the work stoppage was caused solely by the Union's strike as had been found by Referee. Second, in the alternative, Employer contends that the Union's failure to respond to Employer's August 23, 2004, offer of employment under the terms of the expired CBA limits Claimants' eligibility for benefits to the seven weeks between the weeks ending July 6, 2004, and August 28, 2004.

The heart of this appeal is Employer's contention that the Board erred in concluding that the strike was converted to a lockout. Employer's letter of June 24, 2004, offering higher wages and superior health insurance[10] is of no moment, Employer argues, where, as here, the record contains zero evidence that the Union was willing to return to work under the terms of the expired CBA. The Board did not make a factual finding that the Union was willing to return to the status quo because it could not make this finding. In the absence of this critical finding of fact, Employer argues that it was error for the Board to conclude that the strike converted to a lockout. We agree.

 Under Section 402(d) of the Law, an employee shall be ineligible for compensation for any week:

[i]n which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other

he is not a member of an organization which is participating in, or directly interested in, the labor dispute which caused the stoppage of work, and (3) he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in, or directly interested in, the dispute. 43 P.S. 802(d).

9. Our scope of review is limited to determining whether an error of law was committed, constitutional rights were violated or necessary findings of fact are supported by substantial evidence. *Graham v. Unemployment Compensation Board of Review,* 840 A.2d 1054, 1056 (Pa.Cmwlth.2004).

10. The Union did not concede that the new health insurance was superior.

premises at which he is or was last employed. . . .

43 P.S. § 802(d). Our Supreme Court has explained the difference between a lockout and a work stoppage as follows:

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? *If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout'* and the disqualification for unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply.

*Erie Forge Steel Corp. v. Unemployment Compensation Board of Review,* 400 Pa. 440, 444–445, 163 A.2d 91, 93–94 (1960) (commonly known as *Vrotney Unemployment Compensation Case* ) (emphasis added). The party that has "refused to continue operations under the status quo" is the party liable for the work stoppage. *Philco Corp., Inc. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 103, 242 A.2d 454, 455 (1968). To preserve the status quo, the working relationship must continue as if the expired contract were still in effect, and even small changes may be considered a disruption of the status quo. *Grandinetti v. Unemployment Compensation Board of Review,* 87 Pa. Cmwlth. 133, 486 A.2d 1040, 1044 (1985). The determination of whether a strike or lockout has occurred is a mixed question of fact and law. *Philco Corp.,* 430 Pa. at 105 n. 2, 242 A.2d at 456 n. 2.[11] As has been observed by our Supreme Court, "the legal test is easy to verbalize, but most difficult to apply to any given set of facts." *Id.* at 103, 242 A.2d at 455.

■■ Each week of unemployment is the subject of a separate claim. Accordingly, a work stoppage that began as a strike or as a lockout may be converted into its opposite if the party that initiated the work stoppage offers to return to the status quo and the other party refuses. *High v. Unemployment Compensation Board of Review,* 505 Pa. 379, 383, 479 A.2d 967, 969 (1984). To show that its strike had been transformed to a lockout by Employer, the Union had to "show that it made the initial 'peace' move by offering to continue the status quo." *Philco Corp.,* 430 Pa. at 104, 242 A.2d at 456. It was also the Union's burden to show "that the employer refused to do so." *Union Spring Manufacturing Co. v. Unemployment Compensation Board of Review,* 62 Pa.Cmwlth. 343, 436 A.2d 1048, 1050 (1981). Both findings had to be made before the Board could conclude that the strike was converted to a lockout, as a matter of law.

■ The Board's adjudication, not. a model of clarity, contains the factual finding that Employer implemented changes to the contract on July 6, 2004. Adjudication, Finding of Fact No. 6 (F.F.——). For purposes of this discussion, we will assume that instituting higher wages evidenced Employer's refusal to pay lower wages, *i.e.,* a disruption of the status quo. However, that finding alone is inadequate to convert the strike to a lockout because the Union also had to present evidence that it

---

**11.** We agree with the dissent that we are bound by the credibility determinations and factual findings of the Board. The problem here is that the Board's findings of fact do not support the Board's legal conclusion that the Union's strike was converted to a lockout.

had offered to work at the lower wage scale required under the expired CBA. *Philco Corp.*, 430 Pa. at 104, 242 A.2d at 456. It did not do so.

The only offer by the Union to return to work was made on December 17, 2004. Adjudication, F.F. 12. The Board made no finding that the Union was willing to return to work at any other point during the 5–month long work stoppage. It could not do so in light of the record. Christopher Roell, the Union's principal bargaining representative, when questioned by Employer, testified as follows:

> Employer: Prior to December 17th, 2004, did the Union ever unconditionally offer to return to work under the terms and conditions of the expired Collective Bargaining Agreement?
>
> Roell: No.

R.R. 280a. The Union's press releases from June 1, 2004, until December of 2004, all state that Claimants refused to return to work because Employer refused to accept the Union's proposed contract terms. For example, in a press release dated June 25, 2004, the Union quotes a Claimant as stating:

> We got 'em on the ropes! Presby is desperate! They can't take the pressure. We still have 143 of our members on strike! Presby offered to give us twenty-cents more of a raise at the last contract talks, and we know they can't hire enough help. That is why they try

and keep calling us to come back to work. I am telling you all, Presby is desperate. If we stay together, and focused, we will win!

R.R. 383a. This evidence stands squarely in the way of a finding that the Union, as the party initiating the strike, made the "initial 'peace' move" by offering to work under the terms of the expired CBA. *Philco Corp.*, at 430 at 104, 242 A.2d at 456.[12] In the absence of this essential finding, the strike could not be converted to a lockout, as a matter of law.

■ Under the futility doctrine a union is not required to make an offer to return to the status quo if it is clear that the offer will not be accepted by the employer. *Philco Corp.*, 430 Pa. at 104, 242 A.2d at 456. The Union argues that an offer to return to the status quo would have been pointless in light of the unilateral contract changes imposed by Employer in July in accordance with its letter of June 24, 2004. Further, the Union argues, Employer's letter of August 23, 2004, did not eliminate the futility because Employer was hiring "permanent" replacement workers during the work stoppage. We consider these points *seriatim*.

■ First, we consider the Union's argument that Employer's letter of June 24, 2004, made an offer of peace futile. The letter invited workers back at enhanced wages and benefits.[13] This case is

12. Indeed, the Board simply skipped this critical finding of fact, and the explanation for this lacuna is simple. Roell's testimony establishes that until December 17, 2004, the Union did not offer to return to work.

13. The enhanced benefits are a change in the status quo. In all other *status quo* cases, the change resulted in a *reduction* in wages, hours and/or benefits. *See Zappono v. Unemployment Compensation Board of Review*, 756 A.2d 1195, 1197 (Pa.Cmwlth.2000) (where the types of assignments available for union

members were reduced); *High*, 505 Pa. at 381–382, 479 A.2d at 968 (where employer unilaterally instituted a longer working day and reduced teacher salaries).

Here, Employer's June 24, 2004, letter clearly states that employees would receive a $.25 hourly increase in wages "across the board." R.R. 61a. Employer's explanation of a "richer health insurance plan" is as follows:

unique because all other futility cases show the employer taking a hard line, expressly stating that it would not return to the status quo.[14] For example, in *Stanley Flagg and Co., Inc. v. Unemployment Compensation Board of Review*, 605 A.2d 443, 445 (Pa.Cmwlth.1992), the employer informed employees that a wage concession was needed and returning to the status quo would not "cut it."[15] Even so, a hard bargaining line does not itself entitle either party to invoke the futility doctrine. As has been explained by our Supreme Court:

> [T]he incidents common to all types of bargaining must be expected and indulged; e.g., wordy chaffering, haggling over details, maneuvering for position, feigned ultimatums, offers of compromise settlements, and the like. Thus we do not feel that a hard bargaining line can by itself support an invocation of the futility doctrine.

*Philco Corp.*, 430 Pa. at 108, 242 A.2d at 458 (citations omitted).

We cannot say that Employer's June 24, 2004, letter shut the door to peace on any other terms. If the Union had been willing to continue operations under the terms of the expired CBA, which would have striking employees returning to work at lesser pay, it had only to notify Employer of that fact. As stated in *Philco Corp.*,

> When it is considered that *this entire controversy could have been avoided had the union merely asked one simple question,* or sent some of its members to work on Monday in a bona fide effort to continue the status quo, this Court will not allow such a question to go unasked, or such action to go untaken, without a clear showing that a request for status quo would actually have been futile.

*Philco Corp.*, 430 Pa. at 110, 242 A.2d at 459 (emphasis added). However, instead of asking that "one simple question," the Union filed charges with the National Labor Relations Board. It was the Union's right to do so, but it is difficult to construe this move as an offer of peace.

The Board did not make a finding of fact that Employer refused to allow workers to return to work under the terms of the expired CBA, making an offer by the Union futile. Given this record, it could not do so. Employer repeatedly offered

---

For your information, other new benefits that you will enjoy upon returning to work include:
> A health care plan with benefits levels of:
✓ $10.00 co-payment for prescription drugs
✓ $15.00 co-payment for physician office visits;
> *A guarantee of 100% employer paid individual coverage for health,* dental and vision insurance for fulltime employees[.]
R.R. 61a–62a (emphasis added). The Union did not accept the premise that the health care coverage was "richer." Christopher Roell, the Union's principal bargaining representative, testified as follows:
Union: Can you please explain what ... the Union's reaction to the two, bullet points with respect to the healthcare coverage?
Roell: Truth be told, we were blown away because we had never received a summary of the plan description, we had never re-

ceived ... the packet that tells where you can go for your physician's visits.... We didn't have much information on the plan at all to make a decision. We didn't have the premium rates.
R.R. 292a–293a.

14. *See Odgers v. Unemployment Compensation Board of Review,* 89 Pa.Cmwlth. 439, 492 A.2d 808, 817 (1985) ("Where employees are confronted with no alternative but returning to work under a unilaterally imposed contract which upsets the existing status quo, there is no duty on them to make an offer to return to work under that status quo.").

15. *See also Small Tube Products, Inc. v. Unemployment Compensation Board of Review,* 198 Pa.Super. 308, 181 A.2d 854, 856 (1962) (commonly known as *Irvin Unemployment Compensation* Case) (the company president informed the workers that "[a]nyone coming in to work will be on my terms.").

Claimants the opportunity to return to work under the terms of the expired CBA. In its letter of June 16, 2004, Employer urged striking workers to return to work while negotiations continued. Earl Bugaille, Employer's spokesman, was quoted in the *Washington Observer–Reporter* as saying Employer was giving Claimants every opportunity to return to work. The Union issued many public statements about the work stoppage, but none of those statements claimed that Employer would not allow Union members to return to work under the terms of the expired CBA. By contrast, Employer demonstrated that it was receptive to an offer by the Union to return to work under the status quo because some of the striking Union members did return to work. *T.B. Wood's Sons Co. v. Unemployment Compensation Board of Review*, 150 Pa.Cmwlth. 217, 615 A.2d 883, 887 (1992) (the fact that some union members returned to work will support the finding that the employer was receptive to a peace offer by the union.).

We turn, then, to Employer's letter of August 23, 2004, which the Union claims to support, not refute, the futility of offering to return to the status quo. In support, it directs us to *Schott Glass Technologies, Inc. v. Unemployment Compensation Board of Review*, 832 A.2d 554 (Pa. Cmwlth.2003). In that case, the employer upset the status quo by eliminating the union's traditional form of health insurance that had been a part of the expired collective bargaining agreement.[16] Thus, the union's offer to return to the status quo would have been futile. *Id.* at 556.

■ By contrast, in this case, Employer's letter of August 23, 2004, invited Claimants to return to work under the terms of the expired CBA. Employer stated that "it withdraws the terms and conditions unilaterally imposed on July 2, 2004." R.R. 369a. It then stated that it was Employer's "intention to recreate the status quo ante." [17] *Id.* These simple, declarative sentences support only one conclusion: Claimants could return to work under the terms of the expired CBA. Nevertheless, the Union argues there is doubt. It claims that by using the word "intention," Employer communicated at best a commitment to a future deed, not a present one. This semantic attack is not persuasive because Employer also stated, in the present tense, that it was "withdrawing" the unilateral changes to the contract.

■ Finally, we consider the Union's contention that the hiring of replacement workers made it Employer's obligation to advise the Union that work was available and an offer by the Union futile. It is true that the hiring of permanent replacements can be construed a constructive discharge.[18] However, the notion that a constructive discharge was effected by

16. In *Schott Glass* the employer's health insurance was provided by contract with a third party. By contrast, Claimants were covered by the UPMC Health Plan, *i.e.*, Employer's own plan.

17. In weighing the evidence, the Referee found that the August 23, 2004, letter was an offer to Claimants to return to work under the terms and conditions of the expired CBA. Referee Decision, February 9, 2005, at Findings of Fact 7. While the Board has the duty as finder of fact to weigh the evidence and determine the credibility of witnesses, it is "not free to ignore the overwhelming evidence in favor of a contrary result not supported by the evidence." *Odgers v. Unemployment Compensation Board of Review*, 89 Pa.Cmwlth. 439, 492 A.2d 808, 814 (1985).

18. In *Canonsburg General Hospital v. Unemployment Compensation Board of Review*, 156 Pa.Cmwlth. 533, 628 A.2d 503, 510 (1993) (emphasis original), this Court stated:

[W]here an employer hires *permanent* replacement employees, absent any evidence in the record and pertinent findings thereon that continuing work remains available to the striking workers, the case must be con-

Employer is at complete odds with the record. All communications from Employer to Claimants throughout the work stoppage, including the letters of June 24, 2004, and August 23, 2004, invited them to return to work. Work was available throughout the work stoppage. No Claimant lost his or her job due to the hiring of replacement workers; all have returned to work; and Claimants do not claim to have suffered a loss of work hours as a result of Employer hiring replacement workers. Ms. Porter testified that Employer routinely runs standard advertisements for workers, regardless of a work stoppage or any labor dispute, because of employee attrition. Employer needed to hire replacement workers in order to maintain operations during the strike, but there was no evidence that these workers were intended to, or did, displace the striking employees. The Board's own factual finding states:

> Throughout the labor dispute, [Employer] maintained regular operations through the use of non-Union staff and by hiring new employees.

Adjudication, F.F. 10. The Board did not find that replacement workers were hired for any reason save to provide care to the residents during the work stoppage.

■ The burden was on the Union to show that it had a reasonable belief that its members had been permanently replaced; only then did Employer have to show that the replacements were not permanent. *Canonsburg*, 628 A.2d at 510. Again, the Board did not make the finding that the Union had a reasonable belief that the replacement workers were permanent, and on this record, it could not.[19] The word "permanent" was used once in a newspaper account. Uncorroborated double hearsay cannot support a finding that Employer intended the replacement workers to be permanent or a finding that the Union's belief that the replacements were permanent was a reasonable one.

■ Even the Board could not find that the hiring of replacements made an offer of peace by the Union futile. The best the Board could muster was that Employer's hiring of replacement workers rendered an offer by the Union "not feasible." Adjudication at 3. Futility is a high standard. *Small Tube Products, Inc. v.*

---

sidered as one where the employment relationship has been severed.

The burden is upon the employer to show that it advised the striking employees that despite the hiring of permanent replacements, work was still available to them. *Id.* Stated otherwise, an employer that replaces a striking employee with a permanent new hire effects a constructive discharge of the striking employee. *See Reading Nursing Center v. Unemployment Compensation Board of Review*, 663 A.2d 270, 273 (Pa.Cmwlth.1995). However, it is the burden of the striking employees, first, to show that they have a reasonable belief that they have been replaced by permanent new hires. Only then does the burden shift to the employer to show that the new hires are temporary and that work was still available to the striking employees. *Id.*

Here, the Union presented no evidence that it had a reasonable belief that the striking employees were being permanently replaced. The newspaper article in which "permanent" appears once is inadequate evidence. In any case, Ms. Porter denied that Employer's negotiator used the word "permanent." By contrast, in *Canonsburg* and *Reading Nursing Center*, the employer called employees individually to inform them they were fired. In *Reading Nursing Center*, 663 A.2d at 272, the employer made statements at a press conference that were confirmed in writing by employer's attorney that striking employees were being replaced permanently. In sum, in this case the burden never shifted to Employer; however, all evidence supports the conclusion if the Employer had the burden, it was satisfied.

19. The Board's finding was to the contrary: that replacements were hired to keep operations going.

*Unemployment Compensation Board of Review,* 198 Pa.Super. 308, 181 A.2d 854 (1962). This high standard is not satisfied by finding that an offer by the Union was "not feasible." Simply, the observation that a peace offer was "not feasible" is not the equivalent of a legal conclusion that a peace offer would be "futile."

In sum, the evidence of record does not support either a finding of fact or a conclusion of law that an offer by the Union to return to work "would definitely not [have been] accepted by management." *Philco Corp.,* 430 Pa. at 104, 242 A.2d at 456. We conclude that the Board erred. The Union, not Employer, was responsible for the work stoppage. The Union disrupted the status quo by initiating a strike, and it did not produce any evidence that it was ever willing to return to work in accordance with the terms of the expired CBA and that Employer refused that offer. As a result of the Union's refusal to return to the status quo, Claimants are not entitled to benefits for any week during the work stoppage that took place between June 1, 2004, and December 27, 2004.[20]

Accordingly, the decision of the Board is reversed.

### ORDER

AND NOW, this 23rd day of May, 2006, the decision of the Unemployment Compensation Board of Review dated July 22, 2005, in the above captioned matter, is hereby reversed.

### DISSENTING OPINION BY Judge SMITH–RIBNER.

I respectfully disagree with the majority's decision to reverse the order of the Unemployment Compensation Board of Review, which held that Claimants were not ineligible under Section 402(d) of the Unemployment Compensation Law, 43 P.S. § 802(d), for benefits for weeks ending July 17, 2004 and "thereafter." The majority would deny Claimants benefits for any period of their unemployment between the union's strike of June 1, 2004 and the workers' return to work as of December 27, 2004. Under the majority's view, Employer (Presbyterian SeniorCare) made a bona fide effort to maintain the status quo, despite the Board's findings to the contrary. Employer suggests that if the Court agrees that the strike was converted to a lockout as of July 10, 2004 as the Board found, then this Court "at the least" should limit Claimants' eligibility for benefits only for the weeks ending July 17, 2004 through August 30, 2004. That period takes into account Employer's August 23, 2004 offer to return to work.

I disagree with the majority because its ruling is based on a usurpation of the role and authority of the Board, as the ultimate fact finder in unemployment compensation cases. *See Taylor v. Unemployment Compensation Board of Review,* 474 Pa. 351, 378 A.2d 829 (1977). The Board is empowered to make its own findings as to witness credibility and evidentiary weight, *Peak v. Unemployment Compensation Board of Review,* 509 Pa. 267, 501 A.2d 1383 (1985), and they are conclusive on appeal so long as they are supported by substantial evidence in the record. *Taylor.* In this case, the majority has made its own findings as to what evidence should be credited and

---

**20.** In light of our determination on Employer's first issue, we need not address Employer's second issue. We disagree with the dissent's view that Employer's strategy of presenting an alternative legal position is of any moment. Employer made it clear in its brief and in its oral argument that its alternate legal argument should not be construed as a lack of confidence in its primary position that the Union, not Employer, was responsible for the work stoppage.

what weight should be accorded the evidence. That is not the Court's role or function in these unemployment compensation cases.

Based on the Board's findings, I conclude that Claimants are eligible for benefits at least for the weeks ending July 17, 2004 (when Employer implemented its final proposed changes to the contract including increase in wages and changes to health benefits) through August 30, 2004 (based on Employer's offer of August 23 for Claimants to return to work under terms and conditions of the expired contract, which Claimants refused). The Board also found that during the work stoppage initiated by the union on June 1, 2004, Employer hired new employees and had no intention of discharging them after the strike.

Due to Employer's unilateral implementation of its final proposal to the parties' contract and its hiring of replacement workers, the Board found that the strike was converted into a lockout as of the week ending July 10, 2004. *See Vrotney Unemployment Compensation Case*, 400 Pa. 440, 163 A.2d 91 (1960) (setting forth the standard for determining when a work stoppage takes the form of a strike or lockout based on a "maintenance of the status quo" test). *See also Schott Glass Technologies, Inc. v. Unemployment Compensation Board of Review*, 832 A.2d 554 (Pa.Cmwlth.2003).

Because the Board made its own credibility determinations and properly weighed the evidence presented, I conclude that the Board's finding that the work· stoppage was converted to a lockout as of the week ending July 10, 2004 is supported by substantial evidence in the record. Therefore, I would affirm the Board's determination that Claimants are eligible for benefits, but I disagree with the Board that benefits should continue for the weeks ending beyond August 30, 2004. Claimants were offered a return to work under terms and conditions of the expired contract, but they refused to return because of questions or uncertainty surrounding the status of the replacement hirees and how they would be integrated into the workforce and questions regarding a return of Claimants' health benefits to their prior level. I am not persuaded that such questions or uncertainty precluded Claimants from accepting the August 23, 2004 offer for them to return to work. Thus the Board's order should be modified to limit Claimants' eligibility to the weeks ending July 17, 2004 through August 30, 2004.